## PERNELL v. SOUTHALL REALTY

No. 72-6041.  Argued February 19, 1974—Decided April 24, 1974

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined.  BURGER, C. J., and DOUGLAS, J., concurred in the result.

*Norman C. Barnett* argued the cause for petitioner. With him on the briefs was *Michael Boudin.*

*Herman Miller* argued the cause for respondent.  With him on the brief was *Michael Ross.**

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The question presented in this case is whether the Seventh Amendment guarantees the right to trial by jury in an action brought in the District of Columbia for the recovery of possession of real property.  In May 1971, petitioner, Dave Pernell, entered into a lease agreement with respondent, Southall Realty, for the rental of a house in the District of Columbia.  In July 1971, Southall filed a complaint in the Superior Court for the

---

*\*Allen. G. Siegel* and *Daniel C. Kaufman* filed a brief for the Apartment House Council of Metropolitan Washington, Inc., as *amicus curiae* urging affirmance.

District of Columbia seeking to evict Pernell from the premises for alleged nonpayment of rent. Suit was brought under D. C. Code §§ 16–1501 through 16–1505, which establish a procedure for the recovery of possession of real property. In his answer, Pernell denied that rent was owing, asserted that Southall maintained the premises in an unsafe, unhealthy, and unsanitary condition in violation of the housing regulations of the District of Columbia,[1] and alleged that Southall breached an agreement to waive several months' rent in exchange for Pernell's making certain improvements on the property. Pernell also claimed a setoff of $389.60 for repairs made to bring the premises into partial compliance with the District's housing regulations and a counterclaim of $75 for back rent paid.

In his answer, Pernell also requested a trial by jury. The trial judge, however, struck the jury demand, tried the case himself, and entered judgment for Southall. Pernell appealed to the District of Columbia Court of Appeals, claiming that the Seventh Amendment guaranteed the right to trial by jury in all cases brought under § 16–1501 and, alternatively, that he was entitled to a jury trial in this case by virtue of the counterclaim and setoff specified in his answer. The Court of Appeals affirmed, 294 A. 2d 490 (1972), holding that jury trials are not guaranteed by the Seventh Amendment in landlord-tenant cases predicated on nonpayment of rent or some other breach of the lease where the only remedy sought is repossession of the rented premises. *Id.*, at 496. The court also held that if Pernell wished

---

[1] In the District of Columbia, a tenant may defend against eviction proceedings for nonpayment of rent on the ground that housing regulations have not been complied with and that the premises are not being maintained in a habitable condition by the landlord. See *Javins* v. *First Nat. Realty Corp.*, 138 U. S. App. D. C. 369, 428 F. 2d 1071, cert. denied, 400 U. S. 925 (1970).

to litigate his counterclaim for damages before a jury, he should have instituted a separate action rather than raise the counterclaim in the landlord's action for repossession. *Id.,* at 498.

Because of the novel nature of the Seventh Amendment question, we granted certiorari. 411 U. S. 915 (1973). We reverse.

## I

Although the statutory cause of action now codified in § 16–1501 dates back to 1864,[2] it was unnecessary until recently for any court to pass upon the Seventh Amendment question now before us. Prior to 1970, D. C. Code § 13–702 preserved the right to jury trial "[w]hen the amount in controversy in a civil action . . . exceeds $20, and in all actions for the recovery of possession of real property . . . ." See, *e. g., Kass* v. *Baskin,* 82 U. S. App. D. C. 385, 164 F. 2d 513 (1947). The matter now appears in a different light, however, since § 13–702 was repealed by the District of Columbia Court Reform and Criminal Procedure Act of 1970. See Pub. L. 91–358, § 142 (5)(A), 84 Stat. 552.

We are met at the outset by the suggestion that, notwithstanding the repeal of § 13–702, it might still be possible to interpret the relevant statutes as providing for a right to jury trial. It is, of course, a " 'cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided.' " *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 369 (1971).

The Court of Appeals recognized that "Congress did not make clear what it intended by the repeal of this section." 294 A. 2d, at 491. Although the legislative

---

[2] See Act of July 4, 1864, c. 243, 13 Stat. 383. See also *infra,* at 377–378.

history on this question is meager, an argument can be made that Congress in 1970 harbored no intent to do away with jury trials, but rather repealed § 13–702 as a housekeeping measure in the belief that jury trials would continue to be afforded in all cases previously covered by that section, including actions for the recovery of possession of real property.[3] The Court of Appeals, however, appears to have been of the view that, regardless of congressional intent, it was no longer possible to interpret the relevant statutes as providing a right to jury trial in light of the outright repeal of § 13–702. In its view, after 1970 the right to jury trial had to stand on constitutional ground if it were to stand at all. We find ourselves bound by that court's analysis of the effect of the 1970 Act in the circumstances of this case.

This Court has long expressed its reluctance to review decisions of the courts of the District involving matters of peculiarly local concern, absent a constitutional claim or a problem of general federal law of nationwide application. See, e. g., Griffin v. United States, 336 U. S. 704, 717–718 (1949); Fisher v. United States, 328 U. S. 463, 476 (1946). See also Miller v. United States, 357 U. S. 301, 306 (1958). In the past, this reluctance has typically

---

[3] The Senate version of the Court Reform Act retained a statutory guarantee of a right to jury trial almost identical to § 13–702. See S. 2601, 91st Cong., 1st Sess., § 202 (Sept. 16, 1969). While the House bill, which was adopted by the Conference Committee, did not contain a similar provision, the House Report seems to indicate that § 13–702 was not repealed in a conscious effort to change the practice of affording jury trial in actions to recover possession of real property, but was struck "as superfluous in light of constitutional jury trial requirements . . . ." H. R. Rep. No. 91–907, p. 164 (1970). See also H. R. 16196, 91st Cong., 2d Sess., § 142 (5)(A) (Mar. 13, 1970); H. R. Conf. Rep. No. 91–1303 (1970). It appears then that Congress itself believed that jury trials were constitutionally required in all actions previously covered by § 13–702 and would continue to be provided in such actions.

been expressed with regard to positions taken by the courts of the District on common-law questions of evidence and substantive criminal law. But in view of the restructuring of the District's court system accomplished by the Court Reform Act in 1970, we believe the same deference is owed the courts of the District with respect to their interpretation of Acts of Congress directed toward the local jurisdiction.

One of the primary purposes of the Court Reform Act was to restructure the District's court system so that "the District will have a court system comparable to those of the states and other large municipalities." H. R. Rep. No. 91-907, p. 23 (1970). Prior to 1970, the District's local courts and the United States District Court and Court of Appeals for the District of Columbia Circuit, unlike their counterparts in the several States, shared a complex and often confusing form of concurrent jurisdiction, with local-law matters often litigated in the United States District Court and decisions of the District of Columbia Court of Appeals reviewable in the United States Court of Appeals for the District of Columbia Circuit. See generally *ibid.*

The 1970 Act made fundamental changes in this structure. The District of Columbia Court of Appeals was made the highest court of the District, "similar to a state Supreme Court," and its judgments made reviewable by this Court in the same manner that we review judgments of the highest courts of the several States. See *ibid.* See also Pub. L. 91-358, § 111, 84 Stat. 475, codified at D. C. Code § 11-102; § 172 (a)(1), 84 Stat. 590, amending 28 U. S. C. § 1257. The respective jurisdictions of the newly created Superior Court of the District of Columbia and of the United States District Court for the District of Columbia were adjusted so as to "result in a Federal-State court system in the District of Columbia

analogous to court systems in the several States." H. R. Rep. No. 91–907, *supra*, at 35.

This new structure plainly contemplates that the de cisions of the District of Columbia Court of Appeals on matters of local law—both common law and statutory law—will be treated by this Court in a manner similar to the way in which we treat decisions of the highest court of a State on questions of state law.[4] Congressional Acts directed toward the District, like other federal laws, admittedly come within this Court's Art. III jurisdiction, and we are therefore not barred from reviewing the interpretations of those Acts by the District of Columbia Court of Appeals in the same jurisdictional sense that we are barred from reconsidering a state court's interpretation of a state statute. See, *e. g., O'Brien* v. *Skinner,* 414 U. S. 524, 531 (1974) ; *Memorial Hospital* v. *Maricopa County,* 415 U. S. 250, 256 (1974). But

---

[4] We do not intend to imply that the District of Columbia Superior Court and Court of Appeals must be treated as state courts for all purposes. Cf. *District of Columbia* v. *Carter,* 409 U. S. 418 (1973). There are apparently several questions as yet unresolved concerning the relationship between the District of Columbia local courts and the United States District Court and the United States Court of Appeals for the District of Columbia Circuit. Among these are whether the United States District Court has jurisdiction under either 28 U. S. C. § 2254 or § 2255 to hear habeas corpus petitions or motions to vacate a sentence brought by persons in confinement by virtue of convictions had in the District of Columbia Superior Court and, if it does not, whether this Court has a special obligation to resolve conflicts between the District's "local" and "federal" courts on questions of constitutional law raised in such petitions. See D. C. Code §§ 16–1901 through 16–1909: Other unresolved questions involve the extent to which the principles of *Younger* v. *Harris,* 401 U. S. 37 (1971), and related cases apply to the relationship between the District's two court systems. See generally *Sullivan* v. *Murphy,* 156 U. S. App. D. C. 28, 50–54, 478 F. 2d 938, 960–964, cert. denied, 414 U. S. 880 (1973). We, of course, express no views on these issues.

the new court structure certainly lends additional support to our longstanding practice of not overruling the courts of the District on local law matters "save in exceptional situations where egregious error has been committed". *Fisher* v. *United States,* 328 U. S., at 476; *Griffin* v. *United States,* 336 U. S., at 718. This principle, long embedded in practice and now supported by the clear intent of Congress in enacting the 1970 Court Reform Act, must serve as our guide in the present case. As no such obvious error was committed here, we must accept the Court of Appeals' conclusion that the right to jury trial must stand or fall on constitutional ground after the repeal of § 13–702. Accordingly, it is to the Seventh Amendment issue that we now turn.

## II

District of Columbia Code § 16–1501 provides a remedy "[w]hen a person detains possession of real property without right, or after his right to possession has ceased . . . ." The statute is not limited to situations where a landlord seeks to evict a tenant, but may be invoked by any "person aggrieved" by a wrongful detention of property. *Ibid.* See also *infra,* at 379. Under the statute, when a verified complaint is filed by the person aggrieved by the detention, the Superior Court of the District of Columbia may issue a summons to the defendant to appear and show cause why judgment should not be given against him for the restitution of possession. This summons must be served seven days before the day fixed for the trial of the action. § 16–1502. If, after the trial, it appears that the plaintiff is entitled to possession, judgment and execution for possession shall be awarded in his favor with costs. If, on the other hand, the plaintiff nonsuits or fails to prove his case, the defendant shall have judgment and execution for his costs. See § 16–1503.

The Seventh Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." Like other provisions of the Bill of Rights, it is fully applicable to courts established by Congress in the District of Columbia. See *Capital Traction Co.* v. *Hof,* 174 U. S. 1, 5 (1899).

This Court has long assumed that actions to recover land, like actions for damages to a person or property, are actions at law triable to a jury. In *Whitehead* v. *Shattuck,* 138 U. S. 146, 151 (1891), for example, we recognized that

> "[i]t would be difficult, and perhaps impossible, to state any general rule which would determine, in all cases, what should be deemed a suit in equity as distinguished from an action at law . . . ; but this may be said, that, where an action is simply for the recovery and possession of specific real or personal property, or for the recovery of a money judgment, the action is one at law."

See also *Scott* v. *Neely,* 140 U. S. 106, 110 (1891); *Ross* v. *Bernhard,* 396 U. S. 531, 533 (1970).

Respondent suggests, however, that these precedents should be limited to actions to recover property where title is in issue and that actions brought under § 16–1501 should be distinguished as actions for the recovery of possession where claims of title are irrelevant.[5] The

---

[5] Prior to the enactment of the Court Reform Act in 1970, D. C. Code § 16–1504 provided that if the defendant in an action brought under § 16–1501 pleads title in himself or in another under whom he claims, and provides a surety to pay damages, costs, and reasonable intervening rent for the premises, the court (then the District of Columbia Court of General Sessions) shall certify the proceedings to the United States District Court for the District of Columbia. Today, a rule of the Superior Court provides that

distinction between title to and possession of property, of course, was well recognized at common law. See *Grant Timber & Mfg. Co.* v. *Gray*, 236 U. S. 133, 134 (1915). But however relevant it was for certain purposes, it had no bearing on the right to a jury trial. The various forms of action which the common law developed for the recovery of possession of real property were also actions at law in which trial by jury was afforded.

Over the course of its history, the common law developed several possessory actions. Among the earliest of these was the assize of novel disseisin which developed in the latter half of the 12th century and permitted one who had been recently disseised of his tenement to be put back into seisin by judgment of the King's court.[6] Trial by assize represented one of the earliest forms of trial by jury. After the plaintiff lodged his complaint, a writ would issue bidding the sheriff to summon 12 good and lawful men of the neighborhood to "recognize" before the King's justices[7] whether the defendant had

when an issue of title intrudes in an action brought under § 16–1501, the case is transferred from the Landlord and Tenant Branch which normally tries actions under § 16–1501 to the regular Civil Division. See 294 A. 2d 490, 492 and n. 8.

[6] See F. Maitland, The Forms of Action at Common Law 27–29 (1936); 1 F. Pollock & F. Maitland, The History of English Law 145–147 (2d ed. 1899); 3 W. Blackstone, Commentaries *187–188. Novel disseisin, like the action now embodied in § 16–1501, was designed primarily as a possessory action to permit one who had been ejected from his land to be restored to possession. If the ejector wished to raise questions of title, he could proceed later in a separate action. See T. Plucknett, A Concise History of the Common Law 341 (4th ed. 1948). See also *Grant Timber & Mfg. Co.* v. *Gray*, 236 U. S. 133, 134 (1915). Cf. n. 5, *supra*.

[7] See, *e. g.*, Maitland, *supra*, n. 6, at 83–84. Unlike the forcible entry and detainer remedy discussed *infra*, at 376–381, assizes of novel disseisin were presided over by a judge of the King's court rather than a justice of the peace. See *ibid*. The use of itinerant

unjustly disseised the plaintiff of his tenement.[8]   Like the modern cause of action embodied in § 16–1501, novel disseisin was a summary procedure designed to mete out prompt justice in possessory disputes.[9]

Writs of entry, dating from about the same period, were developed to encompass situations not covered by the assize of novel disseisin.   Novel disseisin, for example, was applicable only where the defendant gained possession wrongfully by putting the plaintiff out of seisin. Writs of entry, in contrast, permitted recovery where the defendant entered into possession lawfully but no longer had rightful possession.[10]   Indeed, one of the writs of entry, the writ of entry *ad terminum qui praeterit*, could be used by a plaintiff to recover lands from a defendant who had originally held them for a term of years, which term had expired.[11]   The writ, in other words, embodied a cause of action quite similar to that

justices of the King's court to travel around the countryside on a regular basis to preside over the assizes was confirmed in Magna Carta, c. XII (1225).   See also 1 Pollock & Maitland, *supra,* n. 6, at 155–156.

[8] In its origin trial by assize was slightly different from trial by jury as we know it today.   In particular the jurors, or "recognitors" as they were then known, were summoned by the original writ and asked to answer a question posed by the writ itself as contrasted to the modern practice whereby jurors are not called into a case until it appears that questions of fact are raised by the pleadings. See generally 1 W. Holdsworth, A History of English Law 330–331 (1927).   In course of time, however, the recognitors summoned by the writ of novel disseisin assumed the functions of a modern jury. See 1 Pollock & Maitland, *supra,* n. 6, at 149; Maitland, *supra,* n. 6, at 35.

[9] See Maitland, *supra,* n. 6, at 29; M. Hale, The History of the Common Law 175 (4th ed. 1779).

[10] See Maitland, *supra,* n. 6, at 44–46; Plucknett, *supra,* n. 6, at 342–343.

[11] *Id.,* at 343; Maitland, *supra,* n. 6, at 39; 3 Blackstone, *supra,* n. 6, at *183 n. z.

encompassed in § 16–1501. Significantly for present purposes, it is clear that either party could demand a jury trial.[12]

Both of these forms of action, though not legally abolished until well into the 19th century,[13] had fallen into disuse by the time our Constitution was drafted. By then, ejectment had become the most important possessory action. Ejectment originated as a very narrow remedy, designed to give the lessee of property a cause of action against anyone who ejected him, including his lessor.[14] But by a variety of intricate fictions, ejectment eventually developed into the primary means of trying either the title to or the right to possession of real property.[15]

In particular, ejectment became the principal means employed by landlords to evict tenants for overstaying the terms of their leases, nonpayment of rent, or other breach of lease covenants.[16] Had Southall Realty

---

[12] Maitland, supra, n. 6, at 39.

[13] See 3 & 4 Will. 4, c. 27, § 36 (1833).

[14] Maitland, supra, n. 6, at 47; Plucknett, supra, n. 6, at 354; 3 Blackstone, supra, n. 6, at *199.

[15] The classic fiction was used where two persons wished to try the title to land. One of them leased it to an imaginary person and the other leased it to another imaginary person. One imaginary lessee "ejects" the other, and in order to try the right to possession of the rival imaginary lessees, the court must necessarily decide which of the real lessors had title to the land. See Maitland, supra, n. 6, at 57; 3 Blackstone, supra, n. 6, at *199–204. Cf. M'Arthur v. Porter, 6 Pet. 205, 211 (1832).

[16] See, e. g., Little v. Heaton, 1 Salk. 259, 91 Eng. Rep. 227 (Q. B. 1702); Roe d. West v. Davis, 7 East 363, 103 Eng. Rep. 140 (K. B. 1806); Right d. Flower v. Darby, 1 T. R. 159, 99 Eng. Rep. 1029 (K. B. 1786); Doe d. Spencer v. Godwin, 4 M. & S. 265, 105 Eng. Rep. 833 (K. B. 1815); Doe d. Ash v. Calvert, 2 Camp. 387, 170 Eng. Rep. 1193 (N. P. 1810). Indeed, the use of ejectment in landlord-tenant disputes became so widespread that a statute was

leased a home in London in 1791 instead of one in the District of Columbia in 1971, it no doubt would have used ejectment to seek to remove its allegedly defaulting tenant. And, as all parties here concede, questions of fact arising in an ejectment action were resolved by a jury.[17]

Notwithstanding this history, the Court of Appeals reasoned that an action under § 16–1501 was not the "equivalent" of an action of ejectment. 294 A. 2d, at 492. It noted that another section of the D. C. Code sets forth a more specific action of ejectment.[18] Moreover, the expedited character of a § 16–1501 proceeding was seen as contrasting sharply with the archaic limitations and cumbersome procedures that marked the common-law action of ejectment. *Ibid.* Since, in its opinion, neither § 16–1501 nor its equivalent existed at common law, the Court of Appeals held that the Seventh Amendment did not guarantee the right to jury trial.

In our view, this analysis is fundamentally at odds with the test we have formulated for resolving Seventh Amendment questions. We recently had occasion to note that while "the thrust of the Amendment was to preserve the right to jury trial as it existed in 1791, it has long been settled that the right extends beyond the common-law forms of action recognized at that time." *Curtis* v. *Loether,* 415 U. S. 189, 193 (1974). The phrase "suits at common law" includes not only suits

"which the *common* law recognized among its old

---

enacted to simplify its application to these cases. See 4 Geo. 2, c. 28 (1731).

[17] See *Whitehead* v. *Shattuck,* 138 U. S. 146 (1891). See also *Doe d. Cheny* v. *Batten,* 1 Cowp. 243, 98 Eng. Rep. 1066 (K. B. 1775); *Goodright d. Charter* v. *Cordwent,* 6 T. R. 219, 101 Eng. Rep. 520 (K. B. 1795).

[18] D. C. Code § 16–1124. This statute is apparently derived from 4 Geo. 2, c. 28, §§ 2–4 (1731). See n. 16, *supra.*

> and settled proceedings, but suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered . . . . In a just sense, the amendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights." *Parsons* v. *Bedford,* 3 Pet. 433, 447 (1830) (emphasis in original).

Whether or not a close equivalent to § 16–1501 existed in England in 1791 is irrelevant for Seventh Amendment purposes, for that Amendment requires trial by jury in actions unheard of at common law, provided that the action involves rights and remedies of the sort traditionally enforced in an action at law, rather than in an action in equity or admiralty. See *Curtis* v. *Loether, supra,* at 195.

The proceeding established by § 16–1501, while a far cry in detail from the common-law action of ejectment, serves the same essential function—to permit the plaintiff to evict one who is wrongfully detaining possession and to regain possession himself. As one commentator has noted, while statutes such as § 16–1501 were "unknown to the common law . . . [t]hey are designed as statutes for relief, not to create new causes of action. The evident intention is to give this summary relief in those cases where . . . the action of ejectment would lie." [19] Indeed, the courts of the District themselves have frequently characterized the action created in § 16–1501 as a "substitute" for an ejectment action.[20] Moreover, it appears

---

[19] See 3A G. Thompson, Real Property § 1370, pp. 718–719 (1959).

[20] See, *e. g., Shapiro* v. *Christopher,* 90 U. S. App. D. C. 114, 123, 195 F. 2d 785, 794 (1952); *Service Parking Corp.* v. *Trans-Lux*

that every action recognized in 1791 for the recovery of possession of property carried with it the right to jury trial. Neither respondent nor the Court of Appeals was able to point to any equitable action even remotely resembling § 16–1501. Since the right to recover possession of real property governed by § 16–1501 was a right ascertained and protected by courts at common law, the Seventh Amendment preserves to either party the right to trial by jury.

### III

Respondent argues, however, that the closest historical analogue to § 16–1501 was neither an action at law nor an action in equity, but rather a forcible entry and detainer statute enacted in the reign of Henry VI. See 8 Hen. 6, c. 9 (1429). That statute made it unlawful to "make any forcible Entry in Lands and Tenements, or other Possessions, or them hold forcibly." § II. Justices of the peace were directed to enforce its provisions. If complaint were made, they were to inquire into the matter and any persons found holding a place forcibly were to "be taken and put in the next Gaol, there to remain convict by the Record of the same Justices or Justice, until they have made Fine and Ransom to the King." § I. The justices of the peace were also empowered "to reseize the Lands and Tenements so entered or holden as afore, and shall put the Party so put out in full Possession of the same Lands and Tenements . . . ." § III.

While respondent's argument is lent some support by the fact that § 16–1501 is presently captioned "Forcible Entry and Detainer," closer examination of the per-

*Radio City Corp.*, 47 A. 2d 400, 403 (D. C. Mun. App. 1946); *Shipley v. Major*, 44 A. 2d 540, 541 (D. C. Mun. App. 1945).

tinent history reveals that respondent has misconstrued the actual relationship between the two statutes.

The first predecessor of § 16–1501 was the Act of July 4, 1864, c. 243, 13 Stat. 383.[21] That Act provided a remedy for three separate situations: "when forcible entry is made"; "when a peaceable entry is made and the possession unlawfully held by force"; and "when possession is held without right, after the estate is determined by the terms of the lease by its own limitation, or by notice to quit, or otherwise . . . ." See id., § 2.

There is no question but that the first two of these remedies—for forcible entry or for peaceable entry followed by possession unlawfully held by force—can be traced directly to the statute of Henry VI.[22] The English statute, however, had no provision like that in the 1864 Act specifically designed for landlord-tenant disputes.

In 1953, Congress amended the 1864 Act and did away entirely with the provisions relating to forcible entry and peaceable entry with possession unlawfully held by force which can be traced to the English statute. See Act of June 18, 1953, c. 130, 67 Stat. 66. In its place, Congress enacted a general provision dealing with unlawful detention of property which could be invoked,

---

[21] Prior to 1864, landlord-tenant disputes in the District of Columbia were governed by a Maryland statute, Act of Maryland of 1793, c. 43, 2 W. Kilty, Laws of Maryland (1800), which was incorporated into the laws of the District by the Act of Feb. 27, 1801, c. 15, 2 Stat. 103.

[22] The 1864 Act was essentially the same as an 1836 Massachusetts statute. See *Willis* v. *Eastern Trust & Banking Co.*, 169 U. S. 295 (1898). Those parts of the Massachusetts Act involving forcible entry and forcible detainer were derived from the English forcible entry and detainer statutes, including that of Henry VI. See *Page* v. *Dwight*, 170 Mass. 29 (1897); *Boyle* v. *Boyle*, 121 Mass. 85 (1876).

like § 16–1501 today, "[w]henever any person shall detain possession of real property without right, or after his right to possession shall have ceased . . . ." *Ibid.*

Not only is the historical nexus between the two statutes weak, it is also evident that the English forcible entry and detainer statute and § 16–1501 serve totally different functions. While the English statute provided for the restitution of possession in appropriate cases, it was essentially a criminal provision, prosecuted through the usual criminal process.[23] The gravamen of the offense was the use of violence in obtaining or detaining possession.[24] The question in an action brought under the English statute was not who had the better right to possession. If one with the better right used force to oust another, he could be made to relinquish possession to the party he ousted and would be remitted to seeking legal process to obtain his rightful possession. As Blackstone states, there was no "inquiring into the merits of the title: for the force is the only thing to be tried, punished, and remedied . . . ."[25]

---

[23] Suits were brought, for example, in the name of the State. See, *e. g.,* *The King* v. *Wilson,* 8 T. R. 357, 101 Eng. Rep. 1432 (K. B. 1799); *The King* v. *Harris,* 1 Salk. 260, 91 Eng. Rep. 229 (K. B. 1699); *The King* v. *Dormy,* 1 Salk. 260, 91 Eng. Rep. 229 (K. B. 1700). The case was brought by way of indictment. See *Ford's Case,* Cro. Jac. 151, 79 Eng. Rep. 132 (K. B. 1607); W. Woodfall, Landlord and Tenant 814 (12th ed. 1881).

[24] See *The King* v. *Wilson, supra.* It appears that in order for the entry to be forcible, it had to be accompanied by actual violence or terror, such as assault, the breaking open of doors, or the carrying away of the other party's goods. See Woodfall, *supra,* n. 23. See also 4 Blackstone, *supra,* n. 6, at *148. The use of actual force was a prerequisite to recovery under the forcible entry and detainer provisions of the 1864 Act applicable to the District of Columbia prior to 1953. See *Thurston* v. *Anderson,* 40 A. 2d 342 (D. C. Mun. App. 1944).

[25] 4 Blackstone, *supra,* n. 6, at *148. See *Iron M. & H. R. Co.* v. *Johnson,* 119 U. S. 608 (1887).

In contrast, § 16–1501 is not a criminal action intended to redress the use of force, but rather was designed as a general civil remedy to determine which of two parties has the better legal right to possession of real estate. And, in this respect, § 16–1501 is not limited, as was the 1864 Act, to landlord-tenant disputes, but has been held to encompass, for example, suits by a purchaser at a foreclosure sale to evict the former owner,[26] by the heir of property to evict the current occupant,[27] and by a tenant in common seeking to share possession of the premises.[28]

Even were we to accept respondent's contention that the statute of Henry VI provides the closest common-law analogue for § 16–1501, that would lend no support to its argument that no right to jury trial should be recognized in actions under § 16–1501. The fact of the matter is that jury trials before justices of the peace were afforded in actions to recover possession of property brought under the statute of Henry VI.[29] Indeed, the statute itself provides for jury trials.[30]

---

[26] See, e. g., Glenn v. Mindell, 74 A. 2d 835 (D. C. Mun. App. 1950); Surratt v. Real Estate Exchange, 76 A. 2d 587 (D. C. Mun. App. 1950); Sayles v. Eden, 144 A. 2d 895 (D. C. Mun. App. 1958).

[27] See, e. g., Mahoney v. Campbell, 209 A. 2d 791 (D. C. Ct. App. 1965).

[28] See, e. g., Bagby v. Honesty, 149 A. 2d 786 (D. C. Mun. App. 1959).

[29] See 4 Blackstone, supra, n. 6, at *148. See, e. g., Ford's Case, Cro. Jac. 151, 79 Eng. Rep. 132 (K. B. 1607). C. Beard, The Office of Justice of the Peace in England 68 (1904).

[30] "And also when the said Justices or Justice make such Inquiries as before, they shall make, or one of them shall make, their Warrants and Precepts to be directed to the Sheriff of the same County, commanding him of the King's Behalf to cause to come before them, and every of them, sufficient and indifferent Persons, dwelling next about the Lands so entered as before, to inquire of such Entries . . . ." 8 Hen. 6, c. 9, § IV (1429).

Respondent claims, however, that this trial by jury before a justice of the peace was not a trial by jury as that concept came to be established in the Seventh Amendment. Respondent relies primarily on our decision in *Capital Traction Co.* v. *Hof*, 174 U. S. 1 (1899), where the Court held that trial by a jury before a justice of the peace presiding over a small claims suit in the District of Columbia was not a trial by jury in the constitutional sense. This Court reasoned in *Hof* that the District's justice of the peace

> "was not, properly speaking, a judge, or his tribunal a court; least of all, a court of record. The proceedings before him were not according to the course of the common law .... [The Act which permitted him to try cases with a jury] did not require him 'o superintend the course of the trial or to instruct the jury in matter of law; nor did it authorize him, upon the return of their verdict, to arrest judgment upon it, or to set it aside, for any cause whatever; but made it his duty to enter judgment upon it forthwith, as a thing of course. A body of men, so free from judicial control, was not a common law jury; nor was a trial by them a trial by jury, within the meaning of the Seventh Amendment to the Constitution." *Id.*, at 38–39.

We think respondent's reliance on *Hof* is misplaced. Although containing broad language to this effect, see *id.*, at 18, *Hof* does not stand for the proposition that a trial by jury before a justice of the peace was totally unknown at common law. Rather, *Hof* relied on the fact that at common law, justices of the peace had no jurisdiction whatever over civil suits similar to the small claims action involved in that case. *Id.*, at 16. A trial before a justice of the peace in this kind of case,

with or without a jury, was therefore unknown at common law, and could not have been within the contemplation of the Seventh Amendment. *Id.,* at 18.

The Court recognized in *Hof,* however, that English justices of the peace did have criminal jurisdiction. *Id.,* at 16. And, as we have seen, this criminal jurisdiction extended to trial of forcible entry and detainer and included trial by jury. History plainly reveals that a trial by jury before a justice of the peace in England, unlike trial before a justice of the peace in the District of Columbia, was a jury trial in the full constitutional sense. English justices of the peace were required to be learned in the law. They were judges of record and their courts, courts of record. The procedures they followed differed in no essential manner from that of the higher court of assize held by the King's judges. Trial by jury before the justices of the peace proceeded in the usual manner of a criminal trial by jury in the King's court.[31] Respondent's attempted analogy between § 16–1501 and the English forcible entry and detainer statute, rather than cutting against a right to jury trial in the present case, lends further support to our conclusion that § 16–1501 encompasses rights and remedies which were enforced, at common law, through trial by jury.[32]

---

[31] See generally Beard, *supra,* n. 29, at 158–164; McVicker, The Seventeenth Century Justice of Peace in England, 24 Ky. L. J. 387, 392, 403–407 (1936).

[32] Respondent also relied on the fact that the procedure applicable to landlord-tenant disputes in the District of Columbia between 1801 and 1864, which had been incorporated from Maryland law, see n. 21, *supra,* also involved a jury of 12 before a justice of the peace. The Maryland Act embodied a summary means of recovering possession of lands held by tenants after the expiration of their terms, and provided that upon complaint, two justices of the peace shall, through a sheriff, summon 12 good and lawful men of the country to appear before the justices to determine whether resti-

## IV

The Court of Appeals also relied on our opinion in *Block* v. *Hirsh*, 256 U. S. 135 (1921), where we faced a challenge to the constitutionality of a statute transferring actions to recover possession of real property from the courts to a rent control commission. It was there argued that the statute deprived both landlords and tenants of their right to trial by jury. The Court, speaking through Mr. Justice Holmes, rejected this suggestion:

> "The statute is objected to on the further ground that landlords and tenants are deprived by it of a trial by jury on the right to possession of the land.

---

tution of the land should be made to the lessor. See Act of Maryland of 1793, c. 43, 2 W. Kilty, Laws of Maryland (1800).

The Court of Appeals found that this mode of trial, like the procedure involved in *Hof*, was something less than a trial by jury in the constitutional sense. It therefore reasoned that there was no unbroken history of trial by jury in landlord-tenant actions in the District of Columbia and believed this lent additional support to its conclusion that no jury trial was required by the Constitution. 294 A. 2d, at 495.

We disagree. To begin with, the Maryland statute involves a specialized cause of action, limited to landlord-tenant disputes, quite different from § 16–1501, which, as indicated earlier, is a general provision encompassing all disputes over the possession of land. See *supra*, at 379. Moreover, there is no indication, and the court below did not find, that § 16–1501 or any of its predecessor Acts were derived from this Maryland law. See *supra*, at 377–378. Whether or not jury trials were constitutionally required in the Maryland action after it was incorporated into the law of the District of Columbia, and whether or not the procedure actually afforded between 1801 and 1864 amounted to a full jury trial under our decision in *Hof*, are therefore irrelevant to the issue presented in this case. We have no occasion to decide, over 100 years after the fact, whether in suits brought between 1801 and 1864 under this now defunct landlord-tenant statute, parties were denied their Seventh Amendment rights.

> If the power of the Commission established by the statute to regulate the relation is established, as we think it is, by what we have said, this objection amounts to little. To regulate the relation and to decide the facts affecting it are hardly separable." *Id.*, at 158.

The Court of Appeals reasoned that we "could scarcely have made this observation if the right to jury trial was conferred by the Constitution." 294 A. 2d, at 496. We think the Court of Appeals misunderstood the rationale of this case. *Block* v. *Hirsh* merely stands for the principle that the Seventh Amendment is generally inapplicable in administrative proceedings, where jury trials would be incompatible with the whole concept of administrative adjudication. See *Curtis* v. *Loether*, 415 U. S., at 194. See also *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1 (1937). We may assume that the Seventh Amendment would not be a bar to a congressional effort to entrust landlord-tenant disputes, including those over the right to possession, to an administrative agency. Congress has not seen fit to do so, however, but rather has provided that actions under § 16–1501 be brought as ordinary civil actions in the District of Columbia's court of general jurisdiction. Where it has done so, and where the action involves rights and remedies recognized at common law, it must preserve to parties their right to a jury trial. *Curtis* v. *Loether*, *supra*, at 195.

The Court of Appeals appeared troubled by the burden jury trials might place on the District's court system and by the possibility that a right to jury trial would conflict with efforts to expedite judicial disposition of landlord-tenant controversies. We think it doubtful, however, that the right to a jury trial would significantly impair these important interests. As indicated earlier,

the right to trial by jury was recognized by statute for over a century from 1864 to 1970,[33] and it does not appear to have posed any unmanageable problems during that period.

In the average landlord-tenant dispute, where the failure to pay rent is established and no substantial defenses exist, it is unlikely that a defendant would request a jury trial. And, of course, the trial court's power to grant summary judgment where no genuine issues of material fact are in dispute provides a substantial bulwark against any possibility that a defendant will demand a jury trial simply as a means of delaying an eviction. More importantly, however, we reject the notion that there is some necessary inconsistency between the desire for speedy justice and the right to jury trial. We note, for example, that the Oregon landlord-tenant procedure at issue in *Lindsey* v. *Normet*, 405 U. S. 56 (1972), although providing for a trial no later than six days after service of the complaint unless the defendant provided security for accruing rent, nevertheless guaranteed a right to jury trial. Many other States similarly provide for trial by jury in summary eviction proceedings.[34]

---

[33] The Act of July 4, 1864, c. 243, 13 Stat. 383, contemplated determination of the suit by a justice of the peace with appeal to the Supreme Court of the District and trial *de novo* before a jury. See, *e. g., Luchs* v. *Jones*, 8 D. C. (1 MacArthur) 345 (D. C. Supreme Ct. 1874). Subsequent legislation, up to 1970, carefully preserved the right to jury trial. See, *e. g.,* Act of Mar. 3, 1901, c. 854, §§ 20–24 and 80, 31 Stat. 1193 and 1201; Act of Mar. 3, 1921, c. 125, § 3, 41 Stat. 1310.

[34] *E. g.,* Ariz. Rev. Stat. Ann. § 12–1176 (1956); Cal. Civ. Proc. Code § 1171 (1972); Colo. Rule Civ. Proc. 38 (a) (1970); Conn. Gen. Stat. Rev. § 52–463 (1973); Ga. Code Ann. §§ 105–1601, 105–1602 (1966); Ill. Rev. Stat., c. 57, § 11a (1973); Ind. Ann. Stat. § 3–1605 (1968); Kan. Stat. Ann. § 61–2309 (Supp. 1974); Ky. Rev.

Some delay, of course, is inherent in any fair-minded system of justice. A landlord-tenant dispute, like any other lawsuit, cannot be resolved with due process of law unless both parties have had a fair opportunity to present their cases. Our courts were never intended to serve as rubber stamps for landlords seeking to evict their tenants, but rather to see that justice be done before a man is evicted from his home.

*Reversed and remanded.*

THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS concur in the result.

Stat. Ann. § 383.210 (1972); Mich. Stat. Ann. § 27A.5738 (Supp. 1974); N. Y. Real Prop. Actions § 745 (1963); Ohio Rev. Code Ann. § 1923.10 (1968).