(Slip Opinion) OCTOBER TERM, 2006 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LIMTIACO, ATTORNEY GENERAL OF GUAM *v.* CAMACHO, GOVERNOR OF GUAM

### CERTIORARI TO THE SUPREME COURT OF GUAM

No. 06–116.   Argued January 8, 2007—Decided March 27, 2007

The Guam Legislature authorized the Governor to issue bonds to fund the Territory's continuing obligations, but Guam's attorney general refused to sign the necessary contracts, concluding that issuance would violate the debt-limitation provision of Guam's Organic Act, which limits the Territory's public indebtedness to 10% of the "aggregate tax valuation of the property in Guam," 48 U. S. C. §1423a. The Governor sought a declaration from the Guam Supreme Court that issuance would not violate the provision, calculating the debt limitation based on the appraised value of property in Guam. Agreeing, the Supreme Court rejected the attorney general's argument to base the limitation on assessed value. The Ninth Circuit granted the attorney general's certiorari petition, but while the appeal was pending, Congress removed the Circuit's jurisdiction over appeals from Guam. Relying on its holding in *Santos* v. *Guam*, that Congress had stripped it of jurisdiction over pending appeals, the court dismissed the appeal. The attorney general then filed a petition for certiorari in this Court, even though it was more than 90 days after the Guam Supreme Court's judgment.

*Held:*

   1. The Guam Supreme Court's judgment did not become final, for purposes of this Court's review, until the Ninth Circuit issued its order dismissing the appeal. Certiorari petitions must be filed "within 90 days after the entry of," 28 U. S. C. §2101(c), a lower court's "genuinely final judgment," *Hibbs* v. *Winn*, 542 U. S. 88, 98. In some cases, the actions of a party or a lower court suspend the finality of a judgment by "rais[ing] the question whether the court will modify the judgment and alter the parties' rights." *Ibid.* By granting the petition for certiorari, the Ninth Circuit raised that possibility and thus

suspended the finality of the Guam Supreme Court's judgment. Until the Circuit issued its order dismissing the case, the appeal remained pending, and the finality of the judgment remained suspended. Contrary to the Governor's arguments, the judgment was not made final either when Congress enacted the jurisdiction-depriving statute or when the Ninth Circuit decided *Santos*. This holding is limited to the unique procedural circumstances here. Pp. 3–5.

2. Guam's debt limitation must be calculated according to the assessed valuation of property in the Territory. The term "tax valuation" most naturally means the value to which the tax rate is applied. It therefore means "assessed valuation"—a term consistently defined as a valuation of property for tax purposes. Appraised value is simply market value, which may or may not relate to taxation. The Guam Supreme Court's contrary interpretation—that "tax" limits the kinds of property qualifying for inclusion in the debt-limitation calculation—impermissibly rearranges the statutory language. "Tax" modifies "valuation," not "property." Thus, "tax valuation" refers to the type of valuation to be conducted, not the object that is valued. The court also erred in reasoning that, because the Virgin Islands' debt-limitation provision explicitly refers to "assessed value," Congress must have intended to base Guam's limitation on some other value. Congress' rejection of "assessed" says no more than its rejection of "actual" or "appraised," terms it could have used had it meant actual, market, or appraised value. This Court's interpretation comports with most States' practice of fixing the debt limitations of municipalities to assessed valuation. States use clear language when departing from this approach, but Congress has not done so here. The Governor's additional arguments—that this interpretation would result in no debt limitation at all because Guam may arbitrarily set its assessment rate above 100 percent of market value, and that this Court owes deference to the Guam Supreme Court's interpretation of the Organic Act—are not persuasive. Pp. 5–8.

*Reversed and remanded.*

THOMAS, J., delivered the opinion for a unanimous Court with respect to Part II, and the opinion of the Court with respect to Parts I, III, and IV, in which ROBERTS, C. J., and SCALIA, KENNEDY, and BREYER, JJ., joined. SOUTER, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, GINSBURG, and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 06–116

ALICIA G. LIMTIACO, ATTORNEY GENERAL OF GUAM, PETITIONER *v.* FELIX P. CAMACHO, GOVERNOR OF GUAM

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF GUAM

[March 27, 2007]

JUSTICE THOMAS delivered the opinion of the Court.

The Legislature of Guam authorized Guam's Governor to issue bonds to fund the Territory's continuing obligations. Concluding that the bonds would violate the debt-limitation provision of the Organic Act of Guam, §11, 64 Stat. 387, as amended, 48 U. S. C. §1423a, the attorney general[1] of Guam refused to sign contracts necessary to issue the bonds. In response, the Governor sought a declaration from the Guam Supreme Court that issuance of the bonds would not violate the Organic Act's debt limitation. The Guam Supreme Court held that §1423a limits Guam's allowed indebtedness to 10 percent of the appraised valuation, not the assessed valuation, of taxable property in Guam. We granted certiorari to decide whether Guam's debt limitation must be calculated according to the assessed or the appraised valuation of property in Guam. We hold that it must be calculated based on the assessed valuation.

_____

[1] At the time suit was filed, Douglas Moylan served as Guam's attorney general. Alicia Limtiaco has since been elected to the position, and she continues the case in Moylan's place.

I

In 2003, Guam lacked sufficient revenues to pay its obligations. To supplement revenues, the Guam Legislature authorized the Governor to issue bonds worth approximately $400 million. See Guam Pub. L. 27–019. The Governor signed the new legislation and prepared to issue the bonds. However, under Guam law, Guam's attorney general must review and approve all government contracts prior to their execution. Guam Code Ann., Tit. 5, §22601 (1996). The attorney general concluded that issuance of the bonds would raise the Territory's debt above the level authorized by Guam's Organic Act. See 48 U. S. C. §1423a (prohibiting debt "in excess of 10 per centum of the aggregate tax valuation of the property in Guam"). He therefore refused to approve the bond contracts.

In response, the Governor sought a declaration from the Guam Supreme Court that issuance of the authorized bonds would not cause Guam's debt to exceed the debt limitation. That determination turned, in part, on the meaning of the phrase "aggregate tax valuation" in Guam's Organic Act. The attorney general calculated the debt limitation as 10 percent of the assessed valuation of property in Guam. But the Governor calculated the debt limitation as 10 percent of the appraised valuation. Because Guam assesses property at 35 percent of its appraised value, Guam Code Ann., Tit. 11, §24102(f), the attorney general's interpretation resulted in a much lower debt limit. The Guam Supreme Court agreed with the Governor and held that 48 U. S. C. §1423a sets the debt limitation at 10 percent of the appraised valuation of property in Guam.

The attorney general filed a petition for certiorari in the United States Court of Appeals for the Ninth Circuit. See §1424–2 (granting Ninth Circuit jurisdiction over appeals from Guam). The Court of Appeals granted the petition in October 2003. While the appeal was pending, Congress

amended §1424–2 and removed the language that vested jurisdiction in the Ninth Circuit over appeals from Guam. See §2, 118 Stat. 2208, 48 U. S. C. A. §1424–2 (West Supp. 2006). In *Santos* v. *Guam*, 436 F. 3d 1051 (Jan. 3, 2006), the Court of Appeals addressed the effect of the amendment on its jurisdiction. The court held that Congress had stripped its jurisdiction not only prospectively, but also for pending appeals. *Id.*, at 1054. Citing *Santos*, the Ninth Circuit dismissed the attorney general's appeal in this case on March 6, 2006. See App. to Pet. for Cert. 39a.

The attorney general then filed a petition for certiorari in this Court. By statute, certiorari petitions must be filed "within 90 days after the entry of . . . judgment" in a lower court. 28 U. S. C. §2101(c). The attorney general filed his petition more than 90 days after the judgment from which he appeals—that of the Guam Supreme Court—was entered. Accordingly, when we granted certiorari in this case, 548 U. S. ___ (2006), we directed the parties to address both the question presented by petitioner and whether the filing of a petition for certiorari or the pendency of a writ of certiorari before the Court of Appeals suspended the finality of the Guam Supreme Court's judgment for purposes of the 90-day period set out in §2101(c).

II

Only "a genuinely final judgment" will trigger §2101(c)'s 90-day period for filing a petition for certiorari in this Court. *Hibbs* v. *Winn*, 542 U. S. 88, 98 (2004). In most cases, the 90-day period begins to run immediately upon entry of a lower court's judgment. In some cases, though, the actions of a party or a lower court suspend the finality of a judgment and thereby reset the 90-day "clock." *Ibid.* For instance, the timely filing of a petition for rehearing with the lower court or a lower court's appropriate decision to rehear an appeal may suspend the finality of a

judgment by "rais[ing] the question whether the court will modify the judgment and alter the parties' rights." *Ibid.* (citing *Missouri* v. *Jenkins*, 495 U. S. 33, 46 (1990)). So long as that question remains open, "'there is no "judgment" to be reviewed,'" *Hibbs, supra,* at 98 (quoting *Jenkins, supra*, at 46), and §2101(c)'s 90-day period does not run.

The same reasoning applies here. In 2003, the Court of Appeals appropriately exercised discretionary jurisdiction over the attorney general's appeal. See 48 U. S. C. §1424–2. By granting the petition for certiorari, the Ninth Circuit raised the possibility that it might "modify the judgment" or "alter the parties' rights." *Hibbs*, *supra*, at 98. Thus, the Court of Appeals' grant of certiorari suspended the finality of the Guam Supreme Court's judgment and prevented the 90-day clock from running while the case was pending before the Court of Appeals. And until the Ninth Circuit issued its order dismissing the case, the appeal remained pending, and the finality of the judgment remained suspended.

The Governor argues that the judgment was made final earlier—either when Congress enacted the statute depriving the Court of Appeals of jurisdiction or when the Court of Appeals decided in *Santos* that the statute applied to pending cases. But when Congress removed the Ninth Circuit's jurisdiction over appeals from Guam, it did not dismiss this appeal. Likewise, when the Ninth Circuit determined in *Santos*, that Congress had stripped its jurisdiction over pending appeals, the court did not finally determine the rights of the parties in this case. The jurisdiction-stripping statute and *Santos* may have signaled the Court of Appeals' ultimate dismissal of the appeal, but neither created a final judgment in the still-pending case. The attorney general's appeal remained pending until the Ninth Circuit issued its dismissal order. And the pendency of the appeal continued to "raise the question

whether" any further action by the court might affect the relationship of the parties. *Hibbs*, *supra*, at 98. Accordingly, we hold that the judgment of the Guam Supreme Court did not become final, for purposes of this Court's review, until the Court of Appeals issued its order dismissing the appeal.

We emphasize that our holding is limited to the unique procedural circumstances presented here. Specifically, our holding does not extend to improperly filed appeals or filings used as delaying tactics. See *Morse* v. *United States*, 270 U. S. 151 (1926) (holding that second application for leave to file motion for new trial did not suspend the finality of the lower court's judgment).

## III

Having determined that we have jurisdiction, we turn to the merits. As always, we begin with the text of the statute. See *Nebraska Dept. of Revenue* v. *Loewenstein*, 513 U. S. 123, 128 (1994). Guam's Organic Act states that "no public indebtedness of Guam shall be authorized or allowed in excess of 10 per centum of the aggregate tax valuation of the property in Guam." 48 U. S. C. §1423a. The present dispute centers on the meaning of the term "tax valuation." In its unmodified form, the word "valuation" means "[t]he estimated worth of a thing." Black's Law Dictionary 1721 (4th ed. 1951) (hereinafter Black's). But as the parties' competing interpretations demonstrate, there are different sorts of valuations. An appraised valuation is the market value of property. See *id.,* at 129 (defining "appraise" as "to fix and state the true value of a thing"). By contrast, an "assessed valuation" is the "[v]alue on each unit of which a prescribed amount must be paid as property taxes." *Id.,* at 149. These two kinds of valuation are related in practice because a property's assessed valuation generally equals some percentage of its appraised valuation. See, *e.g.,* Guam Code Ann., Tit. 11,

§24102(f) (defining "value" as "thirty-five per cent (35%) of the appraised value"). The assessed valuation therefore could, but typically does not, equal the market value of the property.

Though it has no established definition, the term "tax valuation" most naturally means the value to which the tax rate is applied.[2] Were it otherwise, the modifier "tax" would have almost no meaning or a meaning inconsistent with ordinary usage. "Tax valuation" therefore means "assessed valuation"—a term consistently defined as a valuation of property for purposes of taxation. See Black's 149; see also *id.,* at 116 (6th ed. 1990) (defining "assessed valuation" as "[t]he worth or value of property established by taxing authorities on the basis of which the tax rate is applied").

One would not normally refer to a property's appraised valuation as its "tax valuation." Appraised valuation is simply market value. And market value may or may not relate to taxation. Usually market value becomes relevant to taxation only because a specified percentage of market value is the assessed value to which taxing authorities apply the tax rate. It would strain the text to conclude that "tax valuation" means a valuation a step removed from taxation.

The Guam Supreme Court reached a contrary conclusion by interpreting the word "tax" to limit the kinds of property that qualify for inclusion in the debt-limitation calculation. But that interpretation impermissibly rearranges the statutory language. The word "tax" modifies "valuation," not "property." The phrase "tax valuation"

---

[2] The Guam Legislature passed a law attempting to define the term "tax valuation." See Guam Code Ann., Tit. 11, §24102*(l),* available at http://www.guamcourts.org/justicedocs/index.html (as visited Mar. 16, 2007). But that term appears in Guam's Organic Act, which is a federal statute. As the Guam Supreme Court correctly determined, Guam's territorial legislature cannot redefine terms used in a federal statute.

therefore refers to the type of valuation to be conducted, not the object that is valued.

The Guam Supreme Court also contrasted 48 U. S. C. §1423a's language with explicit references to "assessed valuation" in the debt-limitation provision for the Virgin Islands. See §1403 ("aggregate assessed valuation"). The court reasoned that, by using language in §1423a that differed from that used in the Virgin Islands' debt-limitation provision, Congress expressed its intent to base Guam's debt limitation on something other than assessed value. We disagree. Certainly, Congress could have used the term "assessed valuation." But if Congress had meant actual, market, or appraised value, it could have used any one of those terms as well. See *N. W. Halsey & Co.* v. *Belle Plaine*, 128 Iowa 467, 104 N. W. 494 (1905) (interpreting debt-limitation provision using phrase "actual value"). Or it could have left the word "valuation" unmodified: State courts interpreting other debt-limitation provisions have understood "valuation," standing alone, to mean the market or cash value of property. See, *e.g.*, *Board of Education, Rich Cty. School Dist.* v. *Passey*, 122 Utah 102, 104–106, 246 P. 2d 1078, 1079 (1952). At least in this context, Congress' rejection of "assessed" tells us no more than does its rejection of "actual" or "appraised."

Our interpretation comports with most States' practice of tying the debt limitations of municipalities to assessed valuation. See 15 E. McQuillin, Law of Municipal Corporations §41:7, p. 422 (3d ed. rev. 2005) ("Most of the constitutional and statutory provisions make the assessed value of the taxable property of the municipality the basis for ascertaining the amount of indebtedness which may be incurred . . ."). States that depart from the majority approach use clear language to do so. See *id.,* at 424–425. ("The standard is generally the assessed value of the property for taxation, rather than the actual value, where the two are different; but where the constitution or statute

uses the term 'actual value,' such value governs rather than the taxable value" (citing *N. W. Halsey & Co.*, *supra;* footnote omitted)). Congress has not used such language here. Indeed, as discussed earlier, only a strained reading of "tax valuation" would suggest a departure from the majority approach.

The Governor suggests that our interpretation would result in no debt limitation at all because Guam may arbitrarily set its assessment rate above 100 percent of market value. For two reasons, we think the Governor has overstated this concern. First, most States have long based their debt limitations on assessed value without incident. Second, a strong political check exists; property-owning voters will not fail to notice if the government sets the assessment rate above market value.

Finally, the Governor mistakenly argues that we owe deference to the Guam Supreme Court's interpretation of its Organic Act. It may be true that we accord deference to territorial courts over matters of purely local concern. See *Pernell* v. *Southall Realty*, 416 U. S. 363, 366 (1974) (reviewing District of Columbia Court of Appeals' interpretation of D. C. Code provision). This case does not fit that mold, however. The debt-limitation provision protects both Guamanians and the United States from the potential consequences of territorial insolvency. Thus, this case is not a matter of purely local concern. Of course, decisions of the Supreme Court of Guam, as with other territorial courts, are instructive and are entitled to respect when they indicate how statutory issues, including the Organic Act, apply to matters of local concern. On the other hand, the Organic Act is a federal statute, which we are bound to construe according to its terms.

## IV

For the foregoing reasons, we reverse the judgment of the Guam Supreme Court and remand the case for pro-

ceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 06–116

———————

## ALICIA G. LIMTIACO, ATTORNEY GENERAL OF GUAM, PETITIONER *v.* FELIX P. CAMACHO, GOVERNOR OF GUAM

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF GUAM

[March 27, 2007]

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE ALITO join, concurring in part and dissenting in part.

I agree that the petition for writ of certiorari was timely, and join Part II of the Court's opinion. I disagree, however, that the phrase "tax valuation" in the Organic Act of Guam, §11, 64 Stat. 387, as amended, 48 U. S. C. §1423a, refers unambiguously to assessed value. If I could not go beyond statutory text and the sources relied upon by the Court, a coin toss would be my only way to judgment. But I look to congressional purpose, which points to appraised value as the meaning of the term, leaving me in respectful dissent.

The words "tax valuation" can plausibly be read in either of the ways the parties suggest: as synonymous with assessed value (the way the attorney general and the Court read them), because it is the assessed value to which the tax rate is immediately applied, Guam Code Ann., Tit. 11, §§24102(f), 24103 (1996), or as meaning appraised value, because the appraisal is a "valuation" for "tax" purposes. The Court concedes that the term "tax valuation" has no canonical definition, *ante*, at 6,[1] and

———————

[1] The phrase "tax valuation" had been used in debt limitations for other Territories, see ch. 34, 41 Stat. 1096 (Puerto Rico); ch. 203, 42

says that the term "valuation," standing alone, means
"'[t]he estimated worth of a thing,'" *ante*, at 5 (quoting
Black's Law Dictionary 1721 (4th ed. 1951); alteration in
original). Though taking property's "estimated worth" to
be its "tax valuation" would make practical sense, the
Court believes that construction would read the word "tax"
out of the statute. I do not see the objection, though.
Even if we say "valuation" means actual value, the word
"tax" has a job to do, by specifying that the valuation in
question be the valuation used for tax purposes, thus
ruling out an appraisal made solely for the purpose of
calculating the debt limitation, with its temptation to
indulge in creative accounting when money is tight.[2] But
as I said, seeing the legitimacy of this reading just leaves
us with two textually plausible constructions.

I see no tie-breaker in comparing Guam's debt limita-
tion with those of other Territories. In each Territory
mentioned by the parties, when Congress imposed a terri-
torial debt limitation the assessed value was equal to the
actual value of the property.[3] Thus the attorney general

———————

Stat. 599 (Philippines), but in each of those Territories the issue in this
case was irrelevant because assessed and appraised values were equal.
See *infra* this page and 3, and nn. 3–4.

[2] Though the Court finds the appraised value to be "a step removed
from taxation," *ante*, at 6, the connection of the appraised value to the
tax ultimately imposed is direct enough. It is true that the tax compu-
tation requires multiplying the appraised value by two percentages
(first 35 percent to get the assessed value, Guam Code Ann., Tit. 11,
§24102(f) (1996), and then the 0.25 percent tax rate, §24103) while the
assessed value must only be multiplied by a single percentage. But as
a practical matter, tying the tax to the assessed value ties it to the
appraised value: multiplying the appraised value by 0.0875 percent (35
percent times 0.25 percent) will give you the tax every time.

[3] 48 U. S. C. §1401a ("[A]ll taxes on real property in the Virgin Is-
lands shall be computed on the basis of the actual value of such prop-
erty"); Haw. Rev. Stat., ch. 98, §1212 (1905), Lodging of Respondent
(Doc. 2b) ("[A]ll real property and all personal property within the
Territory shall be subject to an annual tax of one per cent. upon the full

can stress the significance of assessed value and argue that because the debt limitation in the other Territories was based on the assessed value, the same should be true for Guam. And the Governor can argue that because the debt limitation in the other Territories was based on the actual value, that should go for Guam, too. Nor is the tie to be broken by arguing that pegging the territorial debt limit to "tax valuation" suggests that this Territory was meant to be treated more conservatively than a limit turning on full value; the suggestion is balanced by the question (without any answer proposed to us), why Congress would have wished a more restrictive (or nominally more restrictive) regime for certain Territories.[4]

Comparing state practices is no help, either. The Court says that "States that depart from the majority approach" of linking debt limitations to assessed value "use clear language to do so," *ante*, at 7, but in the preceding paragraph the majority recognizes that state courts "have understood 'valuation,' standing alone, to mean the market or cash value of property," *ibid.* So it seems a stretch to suggest that state laws offer a clear rule that Congress

_____

cash value of the same"); An Act to Provide Revenue for the People of Porto Rico, and for Other Purposes, Tit. I, §8 (1901), reprinted in Acts and Resolves of the First Legislative Assembly of Porto Rico 47 (1901), Lodging of Respondent (Doc. 2a) ("All taxable property shall be valued and assessed at its actual market value"); A Compilation of the Acts of the Philippine Commission, Tit. 10, ch. 56, §336(a) (1908), Lodging of Respondent (Doc. 4) ("[T]he board shall proceed to assess the value of each separate parcel of real estate and the improvements thereon, if any, at their true value in money").

[4]The percentage of the valuation at which the various debt limitations were set likewise provides no basis for inferring that Congress had different intentions for different Territories. When the Organic Act of Guam was passed in 1950, each of the debt limitations in the Territories mentioned in n. 3, *supra*, was also set at 10 percent of the relevant valuation. See 48 U. S. C. §1403 (Virgin Islands); 42 Stat. 116 (Hawaii); ch. 34, 41 Stat. 1096 (Puerto Rico); ch. 203, 42 Stat. 599 (Philippines).

may be presumed to have understood as background; better to read the state cases as products of the specific wording of their particular limitations and the state history of property taxation. See, *e.g.*, *Phelps* v. *Minneapolis*, 174 Minn. 509, 511–514, 219 N. W. 872, 873–874 (1928) (relying on text of limitation, other related provisions, and history of property taxation); *N. W. Halsey & Co.* v. *Belle Plaine*, 128 Iowa 467, 470–474, 104 N. W. 494, 495–497 (1905) (same). It almost goes without saying that neither side has cited a state case involving language and background the same as Guam's.

In sum, the congressional mind does not emerge from the words "tax valuation" or any settled construction of that phrase. Fortunately, though, the purpose of the legislation does point to a likely reading. The statute itself makes clear that what Congress meant to provide was a practical guarantee against crushing debt on the shoulders of future generations, and insolvency with the inevitable call for a bailout by Congress. See *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.*, 508 U. S. 439, 455 (1993) ("'[L]ook to the [law's] . . . object and policy'" (quoting *United States* v. *Heirs of Boisdoré*, 8 How. 113, 122 (1849))).

The attorney general claims that her reading is a better fit with these objectives because it ties the legislature's ability to incur debt to its willingness to tax. But this is hardly so. Under the attorney general's approach (now the Court's), the Guam Legislature could double the debt limitation without increasing taxes by a single penny, simply by doubling the assessment rate and cutting the tax rate by half.[5]

----

[5] The specter of mischief extends to an attempt to set the assessment rate above 100 percent. The Court contends that political or practical constraints would foreclose this maneuver. See *ante*, at 8. After today's decision, I suppose we may find out.

Although it is arguable that tying the debt ceiling to the assessed value may to some vague degree enhance legislative accountability by requiring action to raise the debt ceiling as debt piles up, I know of no independent suggestion that the debt limit was designed to operate as a political discouragement, not as a hard cap. It would, after all, have been strange for Congress to set a debt cap to constrain the Guam Legislature, only to leave the limiting figure subject to easy manipulation by the legislature. While I know that actual valuation can be manipulated, too, manipulation of that figure could only be done by officials acting in bad faith and subject to an obvious political or judicial challenge. The Court's approach, by contrast, gives the legislature a green light to subvert its own stated limit with a clear conscience.[6]

The more practical understanding of what must have been intended is a statute tying the debt limitation to Guam's capacity to tax property. The actual, market value of property is the only economic index of Guam's ability to collect property taxes to pay its bills,[7] the only figure under consideration that is fixed in the real world, and the only figure that provides a genuine limitation. This was the figure employed or required by Congress in each of the other Territories mentioned above, see n. 3, *supra*, and I presume that its practical significance was in Congress's mind when it set the debt caps for each of them. I see no reason not to attribute the same practical

---

[6] The attorney general's position would be strengthened if the assessment rate appeared in the Organic Act itself, for then the legislature would lack the power to change it. This state of affairs would be analogous to an assessment rate appearing in a state constitution. See, *e.g.*, Colo. Const., Art. X, §3(1)(b); La. Const., Art. VII, §18(B). But the Organic Act set no assessment rate, leaving that up to the Guam Legislature.

[7] It is not, of course, the only index of Guam's capacity to pay its bills; income taxation is an obvious source of revenue, see 48 U. S. C. §§1421i(a)–(b) (authorizing Guam to collect income tax).

assessment to Congress in this instance.

I would affirm.