840 F.2d 1165
 56 USLW 2527, 18 Collier Bankr.Cas.2d 627,
17 Bankr.Ct.Dec. 369,
Bankr. L. Rep. P 72,208
 In re Billy H. HARBOUR, Debtor.
Donald W. HUFFMAN, Trustee and Bluefield Holding Company,
Plaintiffs-Appellees,
v.
Diana M. PERKINSON and Frank N. Perkinson, Jr., t/a
Perkinson & Perkinson, a Partnership, Defendants-Appellants.
 No. 85-2311.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 6, 1986.
Decided March 2, 1988.
 
 John H. Kennett, Roanoke, Va., for defendant-appellant Frank N. perkinson, jr.
 Arthur P. Strickland; Strickland & Rogers, on brief, for defendant-appellant Diana M. Perkinson.
 Donald W. Huffman (Bird, Kinder & Huffman, Roanoke, Va., on brief), for plaintiffs-appellees.
 Before WIDENER, SPROUSE and CHAPMAN, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 Diana M. Perkinson and her husband, Frank N. Perkinson, Jr., appeal from the district court's order denying their demand for a jury trial in this action against them by Donald W. Huffman, trustee in bankruptcy for the estate of Billy H. Harbour, and Bluefield Holding Company (hereafter Huffman or the trustee). The trustee seeks to recover funds that he alleges Diana Perkinson received from Harbour in transactions voidable as fraudulent transfers and illegal preferences under federal bankruptcy laws, and as voluntary conveyances voidable under Virginia state law. 11 U.S.C. Secs. 543, 547, 548; Va.Code Sec. 55-81.
 
 
 2
 Harbour's creditors placed him in involuntary bankruptcy on February 11, 1982.[1] Harbour remained as the debtor in possession during the Chapter 11 proceedings until the court appointed Huffman trustee on February 8, 1983. On October 21, 1984, Huffman as trustee initiated this action to recover payments Harbour made to Diana Perkinson allegedly as legal fees. The trustee asserts Diana Perkinson received payments totalling $125,713.49 either within one year prior to Harbour being placed in bankruptcy or while he remained as debtor in possession.[2] Diana Perkinson had represented Harbour and Bluefield Holding Company, a company wholly owned by Harbour, and had served as Secretary and registered agent of the company. Frank Perkinson was joined as a co-defendant in the trustee's action because he and his wife practiced law as a partnership, and she had deposited the disputed funds into their joint account.
 
 
 3
 The district court denied the Perkinsons' motion for a jury trial but certified its order for interlocutory appeal. 28 U.S.C. Sec. 1292(b). We granted the Perkinsons' petition for interlocutory appeal. The merits of the trustee's attempt to avoid the transfers and obtain the funds, of course, have not been determined. The issues on appeal involve the jurisdiction of the bankruptcy court and whether the Perkinsons are constitutionally or statutorily entitled to a jury trial to determine the parties' respective rights under 11 U.S.C. Secs. 543, 547, and 548 and Va.Code Sec. 55-81.
 
 
 4
 The Perkinsons first assert, in effect, that the funds Mrs. Perkinson received from Harbour were for fees earned under Virginia law so that the federal bankruptcy court has no jurisdiction to entertain the trustee's action, Northern Pipeline Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). They also assert that both the seventh amendment to the United States Constitution and the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, 98 Stat. 333 (hereafter the 1984 Bankruptcy Act or the 1984 Act) grant them a right to a trial by jury.[3] We hold that the bankruptcy court has jurisdiction over these actions and that neither the seventh amendment nor the 1984 Act require a jury trial. We discuss seriatim the jurisdiction issue, the seventh amendment question and whether, apart from the constitutional requirements, the 1984 Act entitles the Perkinsons to a jury trial in the trustee's action against them.
 
 I.
 
 5
 The Perkinsons advance three related arguments in support of their contention that the bankruptcy court has no jurisdiction over the trustee's actions. First, they assert that under Northern Pipeline a non-Article III bankruptcy judge has no jurisdiction over the trustee's avoidance action based on alleged fraudulent or preferential transfers because the actions involve only rights created by the substantive law of Virginia. They assert that any action involving the sums paid to Mrs. Perkinson is not a "case under Title 11," did not "arise under Title 11;" nor did the issues "arise in a case under Title 11." 28 U.S.C. Sec. 1334.[4] They argue instead that, at most, the issues in this case only "relate to a case under Title 11" and possess the same characteristics as Northern Pipeline's suit against Marathon Pipe Line, which could not be tried by a bankruptcy judge. Second, they argue that if Congress intended to include actions to litigate rights created by state substantive law as "core" proceedings, section 157(b) of the 1984 Act violates the principles of Northern Pipeline.[5] Third, the Perkinsons stress that Harbour transferred some of the property more than a year prior to the filing of the bankruptcy petition and, as to those transfers, the Virginia avoidance law, and not the federal bankruptcy law, provides the essential procedural mechanism under which the trustee can proceed.[6] Assuming these factual contentions are correct, we think neither of these classes of transfers are within the proscription of the Supreme Court's holding in Northern Pipeline.
 
 
 6
 Initially, the Perkinsons maintain that their right to legal fees was created by the substantive law of Virginia, so the trustee's attack of that right can only be determined in a state forum or by an Article III judge. They urge that the trustee's action is similar to Northern Pipeline's action against Marathon, which the Supreme Court reviewed in Northern Pipeline. The trustee, on the other hand, insists that his action is a "core" proceeding "arising in a case under title 11" that, under Northern Pipeline, can be determined by a bankruptcy judge.
 
 
 7
 In Northern Pipeline, the Supreme Court held that a jurisdictional provision of the Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, 92 Stat. 2549, violated the separation of powers doctrine by conferring Article III judicial power on non-Article III bankruptcy judges with respect to proceedings that included those only "related to cases under Title 11." The Court found no constitutional objections to the congressional exercise of its Article I Sec. 8 bankruptcy powers in assigning jurisdiction over traditional bankruptcy matters to bankruptcy courts. Although not so stated by the Court, those proceedings presumably were matters "arising under title 11, or arising in ... a case under title 11." 28 U.S.C. Sec. 1334 (replacing 28 U.S.C. Sec. 1471); see 1 Collier on Bankruptcy p 3.01[c][ii]-[iv] (15th ed. 1987) (hereafter Collier). It held, however, that a contract action based on state law must be resolved in a state court or by an Article III judge. See Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 105 S.Ct. 3325, 3334-35, 87 L.Ed.2d 409 (1985).
 
 
 8
 Our first task is to identify the jurisdictional restrictions applied to bankruptcy courts in Northern Pipeline and to determine if the trustee's action against the Perkinsons comes within them. In the aftermath of Northern Pipeline, the limitations encompassed in the phrase "related to cases under title 11" are not entirely clear. It generally has been held, however, that the Northern Pipeline restriction is limited to actions by the bankrupt or his trustee over the disposition of state-created substantive rights.[7]
 
 
 9
 As Justice Rehnquist said in his concurring opinion to Northern Pipeline:
 
 
 10
 [T]he lawsuit in which Marathon was named defendant seeks damages for breach of contract, misrepresentation, and other counts which are the stuff of the traditional actions at common law.... There is apparently no federal rule of decision provided for any of the issues in the lawsuit; the claims of Northern arise entirely under state law.
 
 
 11
 458 U.S. at 90, 102 S.Ct. at 2881 (Rehnquist, J., concurring).
 
 
 12
 In his dissent, Chief Justice Burger added:
 
 
 13
 [T]he Court's holding is limited to the proposition ... that a "traditional" state common-law action, not made subject to a federal rule of decision, and related only peripherally to an adjudication of bankruptcy under federal law, must, absent the consent of the litigants, be heard by an "Art. III court" if it is to be heard by any court or agency of the United States.
 
 
 14
 Id. at 92, 102 S.Ct. at 2882 (Burger, C.J., dissenting).
 
 
 15
 If there was any question that these statements reflect the limits of Northern Pipeline 's holding, it was dispelled by the Court's decision in Thomas v. Union Carbide Agriculture Products Co., 105 S.Ct. at 3334-35, in which the Court noted:
 
 
 16
 [Our] holding in [Northern Pipeline ] establishes only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review. (Citations omitted).
 
 
 17
 Here, Harbour, the bankrupt, transferred a large amount of money to Mrs. Perkinson. The dispute between the trustee and Mrs. Perkinson over the right to this money does not depend upon the substantive law of Virginia, rather it is governed by federal bankruptcy laws. It is a dispute involving the restructuring of debtor-creditor relations. As the Northern Pipeline plurality opinion noted:
 
 
 18
 the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case.
 
 
 19
 458 U.S. at 71, 102 S.Ct. at 2871.
 
 
 20
 In this case, the transfers that were made within a year prior to the filing of Harbour's bankruptcy petition[8] present very little analytical difficulty; actions to recover them are specifically identified as "core" matters in section 157(b)(2)(F) ("proceedings to determine, avoid, or recover preferences") and (H) ("proceedings to determine, avoid, or recover fraudulent conveyances") of the 1984 Act. Mrs. Perkinson claims she earned the money transferred to her as legal fees. Her contractual right to receive the funds is no doubt a right that existed by virtue of Virginia law. It does not belong, however, to the same species of legal rights involved in Northern Pipeline. Northern Pipeline's action was based on its claim for breach of contract and warranty--a traditional common law action based on no federal rule of decision. The trustee's action is a core proceeding arising under title 11, or arising in a case under title 11,[9] in which Congress gave bankruptcy courts in personam jurisdiction over Mrs. Perkinson and summary jurisdiction to decide this dispute between her and the trustee.
 
 
 21
 In their brief, however, the Perkinsons make the additional argument that some of the involved funds were paid to Mrs. Perkinson more than one year prior to Harbour's bankruptcy and the trustee can only recover those funds under section 55-81 of the Virginia Code.[10] They contend that actions based solely on Virginia's avoidance law only peripherally relate to the administration of Harbour's bankruptcy and are the equivalent of Northern Pipeline's action against Marathon. We are unable to determine from the record if, in fact, some funds were paid to her beyond the controlling bankruptcy time frame. Assuming her factual contentions are correct, however, we are not persuaded that the trustee's recovery under section 55-81 of the Virginia Code should be treated differently from recovery under 11 U.S.C. Secs. 547 and 548 of funds transferred within one year of bankruptcy.
 
 
 22
 First, the language of section 157(b)(2)(F) and (H) does not limit the proceedings to avoid preferences and fraudulent transfers only to those proceedings authorized by sections 547 and 548 of the Bankruptcy Code. It embraces state avoidance laws and includes them as part of the bankruptcy proceedings. 1 Collier p 3.01[b][ii] (15th ed.); Taggart, at 247. The legislative history of section 157(b) certainly demonstrates that this was the intent of Congress.[11] Moreover, section 544(b) gives trustees in bankruptcy the same authority to avoid transfers that an unsecured debtor would have under state law.[12] In Carlton v. Baww, Inc., 751 F.2d 781 (5th Cir.1985), for example, the Fifth Circuit held that an action by the trustee to avoid a fraudulent conveyance under state law, as authorized by section 544(b), is a proceeding arising under title 11 and the district court (and presumably the bankruptcy court) has jurisdiction over the action.[13] Finally, section 157(b)(3) provides that "a determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by state law." 28 U.S.C. Sec. 157(b)(3). In short, the portion of this dispute that must be resolved by the bankruptcy court's interpretation of Va.Code Sec. 55-81 likewise falls within the dispute resolution mechanism of section 157(b). This dispute does not involve the type of state-created substantive rights that Northern Pipeline ruled must be resolved by Article III judges.[14]
 
 II.
 
 23
 The Perkinsons next contend that the seventh amendment of the United States Constitution guarantees them a jury trial. The seventh amendment provides:
 
 
 24
 In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.
 
 
 25
 The nature of the seventh amendment inquiry has been so thoroughly and universally stated that extensive case citation is not necessary.[15] Simply stated, the essence of our seventh amendment inquiry is whether the underlying issues to be ascertained and determined in this proceeding are legal or equitable. If the action is to enforce legal rights, then it falls within the seventh amendment grant of a right to a trial by jury. Curtis v. Loether, 415 U.S. 189, 195, 94 S.Ct. 1005, 1008, 39 L.Ed.2d 260 (1974); see also Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). In deciding this question, courts have traditionally employed a historical test looking to the custom that existed with respect to the action under English common law at the time the seventh amendment was adopted. Baltimore & Carolina Line, Inc. v. Redman, 295 U.S. 654, 657, 55 S.Ct. 890, 891, 79 L.Ed. 1636 (1935); Damsky v. Zavatt, 289 F.2d 46, 48-51 (2d Cir.1961). See also Ross v. Bernhard, 396 U.S. at 533-34, 90 S.Ct. at 735.[16] Our analytical chore, however, has been abbreviated by the Supreme Court's decisions in Schoenthal v. Irving Trust Co., 287 U.S. 92, 53 S.Ct. 50, 77 L.Ed. 185 (1932), and Katchen v. Landy, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), and the congressional enactment of the Bankruptcy Act of 1984. Our inquiry is directed at determining whether the underlying issues in this case are legal or equitable, but we focus on the Supreme Court's decision in Schoenthal, Katchen and Congress' enactment of the 1984 Act.
 
 
 26
 The universal rule under the Bankruptcy Act of 1898[17] and its predecessors[18] had been that actions to set aside the bankrupt's transfers as fraudulent or preferential were actions outside the bankruptcy proceeding and were to be resolved by plenary proceedings in a different forum.[19] Schoenthal, the linchpin case recognizing that rule in the seventh amendment context,[20] unequivocally had determined that actions such as this one were to be considered outside the bankruptcy proceedings, were legal in nature and were under the aegis of the seventh amendment. As in Schoenthal, the Court in Katchen considered (under the Bankruptcy Act of 1898) an action similar to the one we review. It held emphatically that bankruptcy proceedings were equitable. Although the case cast some doubt on the vitality of Schoenthal, the Court refrained from overruling it. The 1984 Act, by designating actions to avoid preferences and fraudulent transfers as core proceedings, mandated that these actions be resolved within the bankruptcy forum by the bankruptcy judge, a legislative mandate that has a direct bearing on the seventh amendment jury question.[21] The combined effect of judicial and legislative actions, we think, is to cast the trustee's claim against the Perkinsons as a bankruptcy proceeding entirely within the traditionally equitable bankruptcy forum[22] and free of the seventh amendment's requirement that in all suits at common law the right to trial by jury shall be preserved.
 
 
 27
 In Schoenthal, the Court stated that "[s]uits to recover preferences constitute no part of the proceedings in bankruptcy but concern controversies arising out of it." 287 U.S. at 94-95, 53 S.Ct. at 51. It said, therefore, that "[t]he question whether remedy must be by action at law or may be pursued in equity notwithstanding objection by defendants depends upon the facts stated in the bill." Id. at 95, 53 S.Ct. at 51. The Court referred both to the historical English practice and to the then current American practice in suits by bankrupts to recover preferential payments.[23] Although Schoenthal dealt with suits to recover preferences, there is little doubt that, under the 1898 Act, the same reasoning would have applied with equal force to an action by a trustee to set aside the transfer as a fraudulent conveyance.
 
 A noted commentator has stated:
 
 28
 It follows that whether the trustee's suit should be at law or in equity is to be judged by the same standards that are applied to any other owner of property which is wrongfully withheld. If the subject matter is a chattel, and is still in the grantee's possession, an action in trover or replevin would be the trustee's remedy; and if the fraudulent transfer was of cash, the trustee's action would be for money had and received. Such actions at law are as available to the trustee today as they were in the English courts of long ago.
 
 
 29
 Glenn, Fraudulent Conveyances and Preferences, Sec. 98 (1940) (footnote omitted). He went on to say with reference to the Supreme Court's decision in Schoenthal:
 
 
 30
 The actual decision was that in the case of a preference the trustee's suit must be at law unless he needs equitable relief for any reason as above suggested. But what is true of a preference, which essentially is an offense against a bankruptcy law as such, is a fortiori true of a fraudulent conveyance, and hence the Supreme Court's decision should be accepted as final for all purposes.
 
 
 31
 Id. It seems clear then that under the doctrine announced in Schoenthal and at least until the Supreme Court's decision in Katchen, adverse claimants like the Perkinsons would have had a right to a jury trial in a trustee's action to avoid and recover the fraudulent or preferential conveyance.
 
 
 32
 Katchen was decided in 1966, thirty-four years after Schoenthal. In it, the Supreme Court reviewed a holding that a bankruptcy court had summary jurisdiction to order a creditor to surrender property that the bankrupt had preferentially transferred to him. The Court upheld the summary jurisdiction of the bankruptcy court and emphasized that the creditor had subjected himself to the jurisdiction of the bankruptcy court by filing a claim in the bankruptcy proceeding. Justice White's opinion stated, with great emphasis, that bankruptcy courts are "essentially courts of equity" and "characteristically proceed in summary fashion...." 382 U.S. at 327, 86 S.Ct. at 471 (citations omitted). The Court also stated:
 
 
 33
 When Congress enacted general revisions of the bankruptcy laws in 1898 and 1938, it gave "special attention to the subject of making [the bankruptcy laws] inexpensive in [their] administration." Moreover, this Court has long recognized that a chief purpose of the bankruptcy laws is "to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period," and that provision for summary disposition, "without regard to usual modes of trial attended by some necessary delay," is one of the means chosen by Congress to effectuate that purpose.
 
 
 34
 Id. at 328-29, 86 S.Ct. at 472 (citations omitted).
 
 
 35
 The Katchen decision, of course, addressed an action by a trustee against an adverse claimant who had filed a claim in the bankruptcy proceeding and thus submitted to the jurisdiction of the bankruptcy court. The Court stopped short of overruling Schoenthal, however, stating:
 
 
 36
 But although petitioner might be entitled to a jury trial on the issue of preference if he presented no claim in the bankruptcy proceeding and awaited a federal plenary action by the trustee, when the same issue arises as part of the process of allowance and disallowance of claims, it is triable in equity.
 
 
 37
 Id. at 336, 86 S.Ct. at 476 (citation omitted).
 
 
 38
 If this language connoted a reticence by the Court to overrule Schoenthal,[24] its reluctance is understandable. Schoenthal was based on solid precedent and historical judicial treatment of actions by debtors or trustees to set aside preferential transfers.[25] Short of congressional action dramatically altering the structure of bankruptcy administration that was established in the early bankruptcy acts, it seems likely that the principle announced in Schoenthal would have remained a permanent fixture in the law of bankruptcy.
 
 
 39
 An essential key to the Court's ruling in Schoenthal that suits to recover preferences were legal in nature was the well-founded concept that Congress intended actions against third parties in general and avoidance actions in particular not to be part of bankruptcy proceedings.[26] Congress dramatically changed this rule, however, in the 1984 Act. It directed that bankruptcy courts may now hear, determine, and enter orders and judgments in all proceedings under Title 11, and all core proceedings arising under Title 11 or arising in a case under Title 11. 28 U.S.C. Sec. 157(b)(1). From the unmistakable language of the Act, it is manifest that Congress intended bankruptcy courts to have jurisdiction over "proceedings to determine, avoid, or recover preferences," 11 U.S.C. Sec. 157(b)(2)(F), and "proceedings to determine, avoid, or recover fraudulent conveyances," 11 U.S.C. Sec. 157(b)(2)(H).
 
 
 40
 Relying on Schoenthal and precedent involving common law actions to avoid transfers, the Perkinsons contend, however, that
 
 
 41
 [i]f the bankruptcy statutes must be interpreted to categorize the adversary suits by the Trustee against the Perkinsons as "core" proceedings and if the bankruptcy statutes must further be interpreted to require core proceedings be tried by the bankruptcy judge and if the Constitution is interpreted to prohibit bankruptcy judges from conducting jury trials, then the appropriate provisions of 28 U.S.C. Sec. 157 are unconstitutional by denying the Perkinsons the right of trial by jury.
 
 
 42
 We disagree.
 
 
 43
 Schoenthal went no further than to hold that a preferential transfer action under the 1898 Act must be tried in a non-bankruptcy forum and that its characterization as being either legal or equitable in the seventh amendment context must, therefore, be determined independently of the bankruptcy proceeding--i.e., its legal or equitable nature must be judged as if it were a unitary common law action to avoid a transfer without any connection to a bankruptcy proceeding.[27] It based its holding, however, on its recognition that avoidance actions were not part of the bankruptcy proceedings and, when judged under the practice of litigating those cases, were considered to be legal in nature.[28] The Court reasserted, moreover, the conventional jurisprudence that bankruptcy proceedings are equitable. Thirty-four years later, Katchen reasserted with even greater force the ancient principle that bankruptcy proceedings are equitable.
 
 
 44
 More importantly for our purposes, Katchen explained the somewhat subtle, but eminently logical, reasoning of seventh amendment jurisprudence relating to bankruptcy controversies. Justice White carefully explained how actions that are, and always have been considered to be, legal for seventh amendment or other purposes, become equitable when merged into bankruptcy proceedings.[29]
 
 
 45
 So, in cases of bankruptcy, many incidental questions arise in the course of administering the bankrupt estate, which would ordinarily be pure cases at law, and in respect of their facts triable by jury, but, as belonging to the bankruptcy proceedings, they become cases over which the bankruptcy court, which acts as a court of equity, exercises exclusive control. Thus a claim of debt or damages against the bankrupt is investigated by chancery methods.
 
 
 46
 382 U.S. at 337, 86 S.Ct. at 477 (quoting Barton v. Barbour, 104 U.S. (14 Otto) 126, 134, 26 L.Ed. 672 (1881)).
 
 
 47
 The Bankruptcy Act, passed pursuant to the power given to Congress by Art I, Sec. 8, of the Constitution to establish uniform laws on the subject of bankruptcy, converts the creditor's legal claim into an equitable claim to a pro rata share of the res....
 
 
 48
 Id. at 336, 86 S.Ct. at 476.
 
 
 49
 Justice White, in answering the creditors' argument that the exercise of summary jurisdiction would violate the Court's holding in Dairy Queen, said:Such a result is not consistent with the equitable purposes of the Bankruptcy Act nor with the rule of Beacon Theatres and Dairy Queen, which is itself an equitable doctrine. In neither Beacon Theatres nor Dairy Queen was there involved a specific statutory scheme contemplating the prompt trial of a disputed claim without the intervention of a jury.
 
 
 50
 Id. at 339, 86 S.Ct. at 478 (citations omitted).
 
 
 51
 In a different context, the Court in Northern Pipeline said:
 
 
 52
 The interaction between the Legislative and Judicial Branches is at its height where courts are adjudicating rights wholly of Congress' creation. Thus where Congress creates a substantive right, pursuant to one of its broad powers to make laws, Congress may have something to say about the proper manner of adjudicating that right.
 
 
 53
 Id., 458 U.S. at 83 n. 35, 102 S.Ct. at 2878 n. 35.
 
 
 54
 The Court recognized in Northern Pipeline that the "reconstructing of debtor-creditor relations" is a pure bankruptcy matter in which Congress could assign jurisdiction to bankruptcy judges. Id. at 71, 102 S.Ct. at 2871. It can hardly be gainsaid that bankruptcy proceedings are equitable. In all the Bankruptcy Acts, at least from 1841 until the Bankruptcy Act of 1978, however, Congress purposefully excluded the actions of a trustee to avoid and recover fraudulent and preferential transfers from its designation of matters considered "pure" bankruptcy or "core" bankruptcy proceedings. See Bardes, 178 U.S. 524, 20 S.Ct. 1000, 44 L.Ed. 1175 (1900); 2 Collier paragraphs 23.12, 23.13 (14th ed.); Taggart, at 233. It just as purposefully reversed this course of action when it enacted the 1978 and the 1984 Acts.
 
 
 55
 Granting bankruptcy courts broad jurisdictional powers to entertain actions aimed at resolving disputes between a trustee and an adverse third party resulted, in large measure, from the deleterious effect of disputes over whether a particular issue was subject to summary or plenary jurisdiction.[30] The summary/plenary distinction and the judicial quagmires resulting from the disputes it generated were the by-products of the 1898 Act rule that third-party claims were to be tried independently of the bankruptcy forum. Congress, after studying this problem for almost ten years,[31] dramatically altered bankruptcy proceedings in the 1978 Act to correct these deficiencies. It not only reconstructed the mechanics of bankruptcy administration, but completely altered the philosophy underlying the litigation of bankruptcy issues. See Taggart, at 233; Countryman, at 7-12. After the Supreme Court declared the jurisdictional provision of the 1978 Act unconstitutional in Northern Pipeline, Congress obviously restructured the jurisdictional grant in the 1984 Act. The jurisdictional features of both acts, however, were designed primarily to eliminate a major defect in bankruptcy litigation--the time, resources and efficiency wasted in deciding whether disputes were to be resolved by summary or plenary proceedings. In the 1978 Act, Congress accomplished this purpose in two ways. First, it expanded the bankruptcy courts' jurisdiction and, second, it allowed them to conduct jury trials in cases that previously had been routed to non-bankruptcy forums.[32] In the 1984 Act, Congress achieved this purpose by granting bankruptcy courts summary jurisdiction over all civil proceedings except those only peripherally related to a case under title 11. By this action, Congress brought all but a very narrow category of cases[33] affecting the bankruptcy estate within the bankruptcy framework, to be litigated in the traditional equitable forum of the bankruptcy court.
 
 
 56
 It is true that in determining seventh amendment rights we examine issues rather than cases. Ross v. Bernhard, 396 U.S. at 538, 90 S.Ct. at 738. Here, however, the issues we examine relate to the restructuring of the debtor-creditor relationship in bankruptcy. American courts have held core bankruptcy proceedings to be equitable from the beginning of our system of bankruptcy.[34] Now, Congress also has determined that actions such as the trustee's in this case are core bankruptcy proceedings requiring summary disposition by a bankruptcy judge. As such, they assume the historical equitable posture of all such bankruptcy proceedings, and the litigants involved in these actions have no seventh amendment right to a trial by jury.[35]
 
 III.
 
 57
 The Perkinsons contend that, even if the seventh amendment does not mandate that they receive a jury trial, provisions of the 1984 Act nevertheless require it.
 
 
 58
 Congress could have exceeded constitutional requirements, of course, and statutorily provided a right to trial by jury in all bankruptcy matters. In fact, as we previously noted, Congress took an expansive approach to jury trials in the 1978 Act. See King, at 705; see also Levy, at 10; Countryman, at 7-12; Note, The Bankruptcy Amendments and Federal Judgeship Act of 1984: The Impact on the Right of Jury Trial in Bankruptcy Court, 16 Tex.Tech.L.Rev. 535, 541 (1985) (hereafter Note). Section 241(a) of that Act, 28 U.S.C. Sec. 1471, provided in part:
 
 
 59
 (a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.
 
 
 60
 (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11.
 
 
 61
 (c) The bankruptcy court for the district in which a case under title 11 is commenced shall exercise all of the jurisdiction conferred by this section on the district courts.
 
 
 62
 Title 28, section 1480, also part of section 241(a) of the 1978 Act, provided in part:
 
 
 63
 (a) Except as provided in subsection (b) of this section, this chapter and title 11 do not affect any right to trial by jury, in a case under title 11 or in a proceeding arising under title 11 or arising in or related to a case under title 11, that is provided by any statute in effect on September 30, 1979.
 
 
 64
 Rather than expand existing rights to jury trials in bankruptcy proceedings, the 1984 Act drastically restricted such rights. For reasons not completely apparent either in the language of the Act or from its legislative history, Congress went beyond those faults identified by the Supreme Court in Northern Pipeline in restructuring the 1978 Act to eliminate its constitutional faults. 1 Collier p 3.01[b][i] (15th ed.). The pervasive jury trial rights contained in section 1480 under the 1978 Act were eliminated. In its stead, Congress provided in part:
 
 Sec. 1411. Jury trials
 
 65
 (a) Except as provided in subsection (b) of this section, this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim.
 
 
 66
 Pub.L. No. 98-353, Sec. 102(a) (codified at 28 U.S.C. Sec. 1411).
 
 
 67
 Congress, in the 1984 Act, granted bankruptcy courts the authority to "hear and determine" matters that previously could only be determined in plenary proceedings, as well as matters that could be determined in summary proceedings. 28 U.S.C. Sec. 157(b)(1). Considered against the background of congressional effort to eliminate the systemic problems caused by the plenary/summary distinction, it seems logical to infer from the structure of the 1984 Act that Congress intended all core proceedings to be determined by exercise of summary jurisdiction. See King, at 703; Taggart, at 248. Apart from that, the plain language of section 1411 indicates almost conclusively that litigants such as the Perkinsons have no statutory right to a trial by jury under the 1984 Act.[36] A comparison of section 1480 of the 1978 Act with the cryptic language of section 1411 in the 1984 Act reinforces that conclusion. The general structure of the jurisdiction sections of the 1984 Act, the absence in it of the broad jury trial provision contained in the 1978 Act, and the 1984 language specifically limiting the right to a jury trial to negligence and wrongful death actions effectively forecloses any argument that Congress intended issues such as are involved here to be tried by jury.
 
 
 68
 The judgment of the district court is affirmed.
 
 
 69
 AFFIRMED.
 
 WIDENER, Circuit Judge, dissenting:
 
 70
 Since I believe that the Perkinsons are entitled to trial by jury, I respectfully dissent.
 
 
 71
 Huffman, as a trustee in bankruptcy, commenced adversary proceedings against the Perkinsons to avoid allegedly preferential and fraudulent transfers or voluntary conveyances. The trustee relied both upon federal law to set aside the transfers as preferential and fraudulent,[1] and also upon Virginia state law which allows for the voiding of voluntary conveyances. Va.Code Sec. 55-81. The trustee seeks repayment or judgment.[2] There is no property in the hands of the Perkinsons which the trustee seeks to recover. The Perkinsons, who have not filed any claim in the bankruptcy case, challenge the court's jurisdiction and demand trial by jury on the claims asserted by the trustee. The district court did not refer these proceedings to a bankruptcy judge, and this appeal is from an interlocutory order of the district court denying trial by jury.
 
 
 72
 My concern is not with the trustee's ability to press for the recovery of preferential, fraudulent or voluntary transfers; rather, it is with the determination that the exercise of all avoiding powers at the trustee's disposal are "core proceedings" subject to summary adjudication by the bankruptcy court and free of the Seventh Amendment's jury requirement.
 
 
 73
 * I agree with the majority that the district court has jurisdiction, although my reasons differ from those given in the majority opinion.
 
 
 74
 Congress has the undoubted power to create federal question causes of action, as it has done here, in 11 U.S.C. Sec. 547 for preferences and Sec. 548 for fraudulent transfers. It also has the undoubted power to authorize a trustee in bankruptcy to proceed against the beneficiary of a preferential or fraudulent transfer under federal substantive law or of a voluntary conveyance under Virginia Code Sec. 55-81 as it has done in 11 U.S.C. Sec. 544(b).
 
 
 75
 Following the 1978 amendments to the Bankruptcy Code as amended in 1984, the trustee has the power to bring into the bankruptcy case the beneficiaries of preferential, fraudulent or voluntary conveyances, even involuntarily as here. Northern Pipeline requires that when someone is made a party in a proceeding in a bankruptcy case involuntarily, as here, that he be brought into an Article III court. The district judge in this case prudently held to himself the decision in the adversary proceeding and did not refer it to a bankruptcy judge. By so doing, the district court wisely finessed the even more ticklish question than the one present here.
 
 
 76
 I can see nothing about bringing the Perkinsons into the case which is a violation of Northern Pipeline and the subsequent case dealing with the same subject, Commodities Future Trading Comm. v. Schor, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). Neither can I see in this case the exercise by Congress of any authority relating to jurisdiction which it did not have. Since the trustee proceeds against the Perkinsons on both federal and state substantive law grounds, it is a matter of indifference on which ground, if any, he may ultimately be successful for the grounds on which he proceeds must govern the procedure.
 
 
 77
 It is the nature of the federal and state causes of action which the trustee asserts, as well as the procedural aspect in which this case finds itself, which must determine whether or not the Perkinsons are entitled to trial by jury, which will be discussed below.
 
 II
 
 78
 The trustee seeks to use his avoiding powers to restore the value of the transferred assets to the debtor's estate.[3] Although the distinction may sometimes be difficult to draw, preferences are generally permitted outside of bankruptcy law while fraudulent or voluntary conveyance law reaches actions taken by a debtor irrespective of the pendency of a bankruptcy case.[4] The justification for fraudulent conveyance law is fundamentally broader than the reasons for a bankruptcy proceeding. The Supreme Court has long recognized the distinction between a fraudulent and preferential conveyance:
 
 
 79
 One is inherently and always vicious; the other innocent and valid, except when made in violation of the express provisions of a statute. One is malum per se and the other malum prohibitum, -and then only to the extent that it is forbidden. A fraudulent conveyance is void regardless of its date; a preference is valid unless made within the prohibited period.
 
 
 80
 Van Iderstine v. National Discount Co., 227 U.S. 575, 582, 33 S.Ct. 343, 345, 57 L.Ed. 652 (1912). And, we too have previously stated our understanding of the distinct natures of these causes of action. In considering the applicability of West Virginia preference and fraudulent conveyance law in a pre-Code bankruptcy case, a case dealing with Sec. 544(b)'s statutory predecessor, we followed the distinction recited in Van Iderstine. David v. Woolf, 147 F.2d 629 (4th Cir.1945).
 
 
 81
 Fraudulent conveyance law has its origins at least as early as the Statute of 13 Elizabeth and has survived essentially intact for four centuries.[5] In England, well before our independence, the common law actions of trover and money had and received were used to recover preferential payments made by bankrupts. Schoenthal v. Irving Trust Co., 287 U.S. 92, 94, 53 S.Ct. 50, 51, 77 L.Ed. 185 (1932). The claims allowed, indeed created, by these common law actions have long histories and existed at common law in 1791 when we adopted the Seventh Amendment.
 
 
 82
 The court today decides that federal bankruptcy law rather than the substantive rule of decision controls all procedural aspects of these adversary proceedings, since the dispute involves the restructuring of debtor-creditor relations. But, I should add, that consideration should not be of controlling moment here, for all bankruptcy cases involve such restructuring. It is the very purpose of bankruptcy. While federal law may provide the rule of decision with respect to the preference and fraudulent conveyance claims asserted under 11 U.S.C. Secs. 547 and 548, it is clear that Virginia law provides the rule of decision in claims asserted under Sec. 544(b). It is Sec. 544(b) which provides the trustee with authority to assert the state law claim. See Glove v. Martin, 236 U.S. 288, 297, 35 S.Ct. 377, 380, 59 L.Ed. 583 (1914); Stellwagen v. Clum, 245 U.S. 605, 614, 38 S.Ct. 215, 218, 62 L.Ed. 507 (1917) (discussing Sec. 70(e) of the Bankruptcy Act of 1898, the predecessor of Sec. 544(b)). It is also true that the Article I, Sec. 8 bankruptcy power allows Congress to suspend conflicting state laws, but suspension occurs only to the "extent of actual conflict with the bankruptcy act of Congress." Stellwagen at 613, 38 S.Ct. at 217. These cases establish that Sec. 544(b) works no such suspension but rather incorporates state law into the bankruptcy scheme, authorizing the trustee to stand in the shoes of unsecured creditors for purposes of asserting any claims available to them and existing under any law. I do not think that such a claim as here, assertible by creditors if there was no bankruptcy case, and to be determined by exclusive reference to state law, is transformed into a Congressionally created wholly federal claim to "restructure debtor-creditor relations." The historical nature of common or state law claims has been preserved by Sec. 544(b). That section simply works no transformation of historically legal claims into purely equitable ones. Rather than being a "core proceeding" within the summary jurisdiction of the bankruptcy court, the claim pressed under Virginia Code Sec. 55-81 is "... a 'private right' for which state law provides the rule of decision. It is therefore a claim of the kind normally assumed to be at the 'core' of matters normally reserved to Article III courts." Schor, 106 S.Ct. at 3259.
 
 
 83
 The federal question claims of preference under Sec. 547 and fraudulent transfer under Sec. 548 fare no better. In Schoenthal v. Irving Trust Co., 287 U.S. 92, 53 S.Ct. 50, 77 L.Ed. 185 (1932), the Supreme Court examined whether or not a claim of preference asserted by a trustee in bankruptcy against the beneficiary of the preference was legal or equitable. In that case, the trustee had asserted his claim of preference in a plenary proceeding in a district court. The Court reversed the court of appeals which had held that a jury trial was not required because the proceeding was equitable and had affirmed the district court which had left the case on the equity side of the docket and tried it without a jury over the defendant's protest. The Court based its decision on the Seventh Amendment right of trial by jury in questions in which the remedy is by action at law. There, as here, "[t]he preferences sued for were money payments of ascertained and definite amounts." 287 U.S. at 95, 53 S.Ct. at 51. So, Schoenthal is a precise ruling of the Supreme Court on the question at hand, that the substantive federal questions sought to be asserted by the trustee are actions at law, for, if a preference is an action at law when a money judgment is the relief sought, how may a fraudulent conveyance be otherwise when the same relief is asked for? Thus, all of the causes of action the trustee asserts in this case are legal rather than equitable, and to make the case even stronger, one of them is a cause of action under state law rather than federal.
 
 
 84
 Congress surely has the power to establish a federal bankruptcy scheme, but the bankruptcy power granted in Article I Sec. 8 (clause 4) is not absolute and cannot be used to abrogate other constitutional guarantees. See, e.g., Louisville Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1934) (bankruptcy power subject to the Fifth Amendment). Indeed, the existence of a federal statutory scheme does not destroy the right to jury trial. Simmons v. Avisco, Local 713, Textile Workers Union, 350 F.2d 1012 (4th Cir.1965) (Landrum-Griffin Act).
 
 
 85
 Civil trial by jury is guaranteed by the Seventh Amendment.[6] While some trace jury trials from even earlier times, it is settled that clause 39 of Magna Carta preserved the right.[7] Not only has the right a long history, it was a theme of our struggle for independence. There are numerous works which recount the role the right to jury trial in civil cases has played in our history. It was perhaps the only right universally guaranteed by state constitutions prior to the revolution; it was guaranteed in the Northwest Ordinance; and secured by the Articles of Confederation.[8] In fact, the Seventh Amendment played a crucial role in ratification of the Constitution. This right, one of "deep interest and solicitude," is to be jealously guarded against encroachment. Parsons v. Bedford, 3 Pet. (28 U.S.) 433, 445-46, 7 L.Ed. 732 (1830). It is against this historical backdrop that the Supreme Court has considered the application of the amendment.
 
 
 86
 The historical test of the cause of action which governs Seventh Amendment jurisprudence was complicated by the merger of law and equity accomplished by the enactment of the Federal Rules of Civil Procedure in 1938. The effect, if any, of the merger, however, has been to enlarge rather than restrict the application of the right to jury trial. In Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 L.Ed.2d 988 (1959), the Supreme Court held that where both legal and equitable issues are presented in a single cause, the right to jury trial is lost in only the most imperative circumstances. Three years later, the Court stated that there is a right to jury trial on issues material to both legal and equitable relief, even if the legal issues are "incidental" to the equitable issues. Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). Still grappling with the problem created by the merger effected by the Federal Rules, the Court emphasized that restrictive application of the Seventh Amendment is not encouraged in Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). Ross stated that the "seventh amendment question depends on the nature of the issue to be tried rather than the character of the overall action," Id. at 538, 90 S.Ct. at 738, and specifically held that there was a right to jury trial on all legal claims in the historically equitable shareholder's derivative suit. The court has upheld the right to jury trial in actions to enforce Congressionally created statutory rights provided the action involves rights and remedies traditionally enforced in an action at law. Curtis v. Loether, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) (Seventh Amendment applies to actions for damages under Title VIII of the Civil Rights Act of 1968); Pernell v. Southall Realty, 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974) (Seventh Amendment applies to courts established by Congress in the District of Columbia in an action to recover possession of real property). Tull v. United States, --- U.S. ----, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) (Seventh Amendment guarantees a jury trial to determine liability in actions by the Government seeking civil penalties and injunctive relief under the Clean Water Act). In Tull, the Court directed that examination of both the nature of the action and the remedy sought governs Seventh Amendment analysis. Absent consent, if the action is one comparable to those which were tried in courts of law in 18th century England, and the remedy sought is legal, the Seventh Amendment attaches. 107 S.Ct. at 1835.
 
 
 87
 The principal and perhaps the only difficulty the majority opinion finds with following the usual analysis of determining what is triable to a jury and what is not is Katchen, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). Katchen involved a trustee's plenary action in a federal district court to recover a money judgment for a preference. The beneficiary of the preference, however, had filed two claims in the proceeding, one for back rent, the other for payment he had made as endorser of a note of the bankrupt. Section 57g of the Bankruptcy Act required that the claim of creditors who had received a preference "should not be allowed unless such creditors shall surrender such preferences...." The trustee objected to the allowance of the creditor's claim, and the Court affirmed the referee's decision to proceed to try the question of whether or not there was a preference in order to ascertain whether or not to allow the creditor's claims. In Katchen, the creditor had submitted himself to the jurisdiction of the bankruptcy court by filing his claims. Thus, there was no question of his involuntarily being made a party to the proceeding, the key question on which Northern Pipeline turns. The Court noted its precedent, that Schoenthal and two of its other cases required a jury trial in a plenary proceeding on the question of whether or not a preference existed, and stated that the question put was whether "the situation is the same when the creditor files a claim and the trustee not only objected to the allowance of the claim but also demands surrender of the preference." 382 U.S. at 328, 86 S.Ct. at 471. The Court held specifically that the situation was not the same. The Court based its decision on the power of the bankruptcy court to allow or disallow claims, which it stated was the full power to inquire into the validity of any alleged debt of the bankrupt upon which a demand or claim against the estate was based. 382 U.S. at 329, 86 S.Ct. at 472. So, far from holding that a jury trial was not required on the question of the existence of the preference, the holding of Katchen is that jury trial is not required on the question of existence of a preference when the creditor has filed his claim and the trustee objects to the allowance of the claim. The Court distinguished the situation in which the creditor had filed a claim and the situation in which the creditor "presented no claim in the bankruptcy proceeding and awaited a federal plenary action by the trustee," 382 U.S. at 336, 86 S.Ct. at 476, which is the precise situation existing in the case before us. To repeat, the Court based the authority for its decision on Sec. 57g which required the bankruptcy court to necessarily determine the amount of the preference so as to ascertain whether the claimant, should he return the preference, had satisfied the condition imposed by Sec. 57g on allowance of the claim. 382 U.S. at 334, 86 S.Ct. at 475. Thus, I do not perceive Katchen to be any stumbling block in applying the regular test of whether or not the cause of action asserted is historically legal or equitable. It is obvious that an Article III judge, sitting in a bankruptcy proceeding, may do just that. It is the "district courts" which have jurisdiction in bankruptcy cases under 28 U.S.C. Sec. 1334, not bankruptcy courts. Under 28 U.S.C. Sec. 157(a), a "district court" "may" refer cases and proceedings to "bankruptcy judges," not bankruptcy courts, who under Sec. 157(b) "may" hear and determine the matters referred (italics added). It would be rather futile to hold, I think, that under Northern Pipeline, if a party is involuntarily brought into a bankruptcy proceeding he must be brought before an Article III court if the Article III court does not have its attendant protections, notably the right to trial by jury.
 
 
 88
 Finally, I cannot leave the subject without calling attention to the fact that the Supreme Court has expressly rejected the notion that there is some necessary inconsistency between the desire for speedy justice and the right to trial by jury. Pernell, 416 U.S. at 383-84, 94 S.Ct. at 1733.
 
 
 89
 The claims asserted by the trustee in this proceeding are historically legal in nature. A money judgment is asked for. The case is pending in a United States district court. I see no reason to deny the Perkinsons their demanded trial by jury.
 
 
 
 [1]
 11 U.S.C. Sec. 303. Chapter 11 is codified at 11 U.S.C. Sec. 1101 et seq. The bankruptcy was converted to a Chapter 7 proceeding on September 13, 1983. 11 U.S.C. Sec. 701 et seq
 
 
 [2]
 Huffman filed a second complaint against the Perkinsons on February 7, 1985, seeking to recover an additional $144,060.81. This sum includes $24,500 as the value of diamond earrings, a Rolex ring and wristwatch, and clothing Harbour allegedly gave Diana Perkinson. The proceedings in that action have been stayed pending the outcome in this appeal of the district court's denial of the jury trial motion made pursuant to the first complaint
 
 
 [3]
 The Perkinsons inexplicably cite both the 1978 and 1984 Acts. The 1984 Act controls the outcome of this case, however. Section 122 of the 1984 Act provides that "amendments made by this title [title I--Bankruptcy Jurisdiction and Procedure] shall take effect on the date of the enactment of this Act [July 10, 1984]," with certain exceptions. Pub.L.No. 98-353, Sec. 122(a), 98 Stat. 333, 346 (1984). Section 553(a) provides that "the amendments made by this title [title III--Amendments to Title 11 of the United States Code] shall become effective to cases filed 90 days after the date of enactment of this Act." Pub.L. No. 98-353, Sec. 553(a), 98 Stat. 333, 392 (1984). We have held that the jurisdictional provisions of the 1984 Act apply to any case pending on July 10, 1984. Creasy v. Coleman Furniture Corp., 763 F.2d 656, 660 (4th Cir.1985); see also In re Hudson Shipbuilders, Inc., 794 F.2d 1051, 1054 n.4 (5th Cir.1986); In re Castlerock Properties, 781 F.2d 159, 161 (9th Cir.1986); Carlton v. Baww, Inc., 751 F.2d 781, 787 n.6 (5th Cir.1985). Most, if not all, issues involved in this appeal relate to jurisdictional disputes that had not arisen or were pending on July 10, 1984. The only non-jurisdictional matter relates to the possible application of 11 U.S.C. Sec. 544, which became effective for cases filed 90 days after July 10, 1984, or October 9, 1984. Here, although the petition was filed in February 1982, the trustee's complaint was filed October 12, 1984. In any event, the provisions of Sec. 544 are essentially the same under both the 1978 and 1984 Acts
 
 
 [4]
 Section 101 of the 1984 Act provides in pertinent part:
 (a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.
 (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.
 28 U.S.C. Sec. 1334.
 
 
 [5]
 Section 104 of the 1984 Act, codified at 28 U.S.C. Sec. 157 (hereafter Sec. 157 of the 1984 Act), provides:
 (a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.
 (b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.
 Section 157(b)(2) provides as follows:
 Core proceedings include, but are not limited to--
 * * *
 (F) proceedings to determine, avoid, or recover preferences;
 * * *
 (H) proceedings to determine, avoid, or recover fraudulent conveyances....
 
 
 [6]
 The trustee filed two actions against the Perkinsons. See supra note 2. The first action sought to set aside transfers of money to Diana Perkinson for legal fees, and this appeal involves only the district court's denial of a jury trial in that action. The complaint reflects that all of the transfers were made within one year of bankruptcy. In view of the record's sparsity and the Perkinsons' contentions on appeal, however, we will assume that some transfers were made more than one year prior to bankruptcy, but within a time frame permitting an action under Sec. 55-81 of the Virginia Code
 
 
 [7]
 Northern Pipeline, 458 U.S. at 87 n. 40, 102 S.Ct. at 2880 n. 40; see also id. at 92 (Burger, C.J., dissenting); 1 Collier p 3.01[c][iv] (15th ed.); Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 105 S.Ct. 3325, 3334-35, 87 L.Ed.2d 409 (1985); 1616 Reminc Limited Partnership v. Atchison & Keller, 704 F.2d 1313, 1318 n. 15 (4th Cir.1983)
 
 
 [8]
 Under 11 U.S.C. Sec. 547(b), the trustee can avoid as preferences certain transfers made within 90 days before the bankruptcy petition is filed, or one year if the transferee is an insider. Mrs. Perkinson was Secretary of Bluefield Holding Company, so for purposes of this appeal we assume, without deciding, that she was an insider. Section 548(a) grants the trustee the authority to avoid fraudulent transfers made by the debtor within one year before the bankruptcy petition was filed. Without considering the merits of the trustee's attempt to avoid the transfers, we consider them as two groups: those made within one year prior to the filing of Harbour's petition and those made more than one year prior to it
 
 
 [9]
 See 1 Collier p 3.01[b][ii] (15th ed.) (equating the jurisdictional provision declared invalid in Northern Pipeline to the provisions in the 1984 Act treating proceedings relating to a case under title 11 and stating that under the 1984 Act "there is no such thing as a core matter which is only 'related to' cases under title 11"). See also Taggart, The New Bankruptcy Court System, 59 Am.Bankr.L.J. 231, 241-42 (1985) (hereafter Taggart), to the effect that the drafters of the 1984 Act dealt with Northern Pipeline by omitting matters only "related to a case under the Code" from the matters over which a bankruptcy judge could exercise jurisdiction. Compare King, Jurisdiction and Procedure Under the Bankruptcy Amendments of 1984, 38 Vand.L.Rev. 675, 689 ( 985) (hereafter King). The author said:
 One could argue that [a case only related to cases arising under title 11] would be a core proceeding. It certainly affects the liquidation of the assets of the estate. The Chapter 11 debtor in Northern Pipeline sued for breach of contract. The cause of action (a chose in action) was an asset of the estate and had to be liquidated.... It is therefore likely that the proceeding also affected the adjustment of the debtor-creditor relationship. If the breach of contract action would be a core proceeding under the 1984 amendments, Congress has not complied with the Supreme Court's mandate and has enacted a constitutionally invalid statute.
 The author also listed in note 44 a number of bankruptcy court holdings indicating that the distinction between these categories of bankruptcy matters is a difficult one to make. But cf. Taggart, at 947 et seq.; Kamp, Court Structure Under the Bankruptcy Code, 90 Com.L.J. 203, 207 (1985).
 
 
 [10]
 Va. Code Sec. 55-81 provides:
 Voluntary gifts, etc., void as to prior creditors.--Every gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law, or which is upon consideration of marriage, shall be void as to creditors whose debts shall have been contracted at the time it was made, but shall not, on that account merely, be void as to creditors whose debts shall have been contracted or as to purchasers who shall have purchased after it was made; and though it be decreed to be void as to a prior creditor, because voluntary or upon consideration of marriage, it shall not, for that cause, be decreed to be void as to subsequent creditors or purchasers.
 
 
 [11]
 Representative Kastenmeier, who introduced the legislation containing Sec. 157, had this to say:
 In this respect, State law rights arising in core bankruptcy proceedings are functionally equivalent to congressionally created rights, because Congress has the power to modify State law rights in bankruptcy proceedings. Unlike the States, Congress may impair the obligations of contracts through the bankruptcy clause. Indeed, the very purpose of bankruptcy is to modify the rights of the debtors and creditors, and the bankruptcy code authorizes the bankruptcy court to abrogate or modify State-created obligations in many ways.
 
 
 [130]
 Cong.Rec. H1110 (daily ed. March 20, 1984)
 
 
 [12]
 Section 544(b) provides:
 (b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.
 11 U.S.C. Sec. 544(b).
 
 
 [13]
 But see King, at 693, where the author states:
 It is difficult, if not impossible, to perceive any conceptual difference between the trustee's use of an individual creditor's right to sue under section 544(b) and the debtor suing for breach of contract as it did in Northern Pipeline.
 
 
 [14]
 But see id., at 689, where the author postulates that some Northern Pipeline-type "related to" matters might be core proceedings under Sec. 157 and, if so, the section would be unconstitutional as violating the principles of Northern Pipeline
 
 
 [15]
 As one noted commentator remarks:
 The Seventh Amendment preserved the right of trial by jury "in suits at common law." Inevitably this calls for some historical inquiry. If the issue in the context in which it arises would have been heard at common law in 1791, when the Seventh Amendment was adopted, or, more accurately, in 1938 when law and equity were merged, it is now triable of right to a jury. There is no right to jury trial if viewed historically the issue would have been tried in courts of equity or if otherwise it would have been tried without a jury.
 Wright & Miller, Federal Practice and Procedure, Sec. 2302, at 14-15 (1971) (footnotes omitted).
 
 
 [16]
 Since the merger of law and equity in 1938, Fed.R.Civ.P. 2, however, the Supreme Court has not adhered rigidly to a historical test. See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). See also Whitlock v. Hause, 694 F.2d 861, 863 (1st Cir.1982). 5 Moore's Federal Practice p 38.09[5-4] (2d ed. 1982); Wright and Miller, Federal Practice and Procedure, Sec. 2302, at 18 (1971). Compare Tull v. United States, --- U.S. ----, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), where Justice Brennan, in the majority opinion, described one important approach to resolving the question of whether an issue is legal or equitable for seventh amendment purposes:
 Our search is for a single historical analogue, taking into consideration the nature of the cause of action and the remedy as two important factors.
 Id., 107 S.Ct. at 1837 n. 6 (citing Pernell v. Southall Realty, 416 U.S. 363, 375, 94 S.Ct. 1723, 1729, 40 L.Ed.2d 198 (1974), and Curtis, 415 U.S. at 195-96, 94 S.Ct. at 1008-1009).
 
 
 [17]
 30 Stat. 544 (1898)
 
 
 [18]
 Congress enacted the first national bankruptcy act in 1800. 2 Stat. 19-21. It was to be in effect for five years, but was repealed in 1803. Congress enacted a second act, the Bankruptcy Act of 1841, 5 Stat. 440, but repealed it in 1843. 1 Collier p 0.04 (14th ed.). Financial stress following the Civil War prompted the Bankruptcy Act of 1867, 14 Stat. 517, which was repealed in 1878. Id. at p 0.05. Congress ultimately enacted the Bankruptcy Act of 1898, which remained in effect until superseded by the Bankruptcy Reform Act of 1978. The 1898 Act was amended extensively by the Bankruptcy Act of 1938, commonly known as the Chandler Act, id. at p 0.07, and was also amended in 1903, 1906, 1910, 1914, 1916, 1917, 1922, 1926, 1932, 1933, 1934 (on four occasions), 1935 (on five occasions), 1936 (on four occasions), 1937 (on two occasions), 1938, 1939, and 1946. Id. at paragraphs 0.06 n. 6, 0.08, 0.09
 
 
 [19]
 1 Collier p 3.01[b][i] (15th ed.)
 
 
 [20]
 In Schoenthal, the Court actually construed a provision of the judicial code, 28 U.S.C. Sec. 384, not the seventh amendment. The Court noted, however, that the provision "guard[s] the right of trial by jury preserved by the Seventh Amendment...." 287 U.S. at 94, 53 S.Ct. at 51
 
 
 [21]
 See In Re O'Bannon, 49 B.R. 763, 766 n. 5 (Bankr.M.D.La.1985), where the bankruptcy court says:
 If Katchen v. Landy stands for the proposition that cases with a clear bankruptcy focus do not involve a Seventh Amendment right to jury, then parties in core matters would have no constitutional jury rights.
 (emphasis in original).
 
 
 [22]
 The early English bankruptcy statutes were administered through the Court of Chancery at the direction of the Lord Chancellor. For a discussion of those statutes see, Jones, The Foundations of English Bankruptcy: Statutes and Commissions in the Early Modern Period, 69 Transactions of the Am.Phil.Soc'y, Part 3 (1979); Levinthal, The Early History of English Bankruptcy, 67 U.Pa.L.Rev. 1 (1919). For a comparison of English and American law and procedures governing the granting of discharges in a historical and modern context, which demonstrates the equitable nature of the proceedings, see Boshkoff, Limited, Conditional, and Suspended Discharges in Anglo-American Bankruptcy Proceedings, 131 U.Pa.L.Rev. 69 (1982)
 
 
 [23]
 The 1898 Act, as amended when Schoenthal was decided, provided two types of jurisdiction. Section 2 of the Act conferred upon the courts of bankruptcy original jurisdiction at law and equity over proceedings under the Act, which included administrative matters, disputes over property in the actual or constructive property of the court, and disputes over the bankrupt's discharge. This was considered summary jurisdiction. Section 23 governed the district court's plenary jurisdiction over controversies at law and in equity. See In re Boss-Linco Lines, Inc., 55 B.R. 299, 302-04 (Bankr.W.D.N.Y.1985). See infra note 25
 
 
 [24]
 Some writers were of the opinion that on the authority of Katchen, even before Congress passed the 1984 Act, there was no seventh amendment right to a jury trial in any bankruptcy proceedings. 1 Collier p 3.01[b][i] at 3-86 (15th ed.). For cases holding to the contrary, see id. at 3-87 n. 178
 
 
 [25]
 Firmly implanted in the structure of all the congressional enactments listed in note 18 was the longstanding English and American principle that actions to avoid preferential and fraudulent conveyances were not a part of the proceedings in bankruptcy, but were part of controversies arising out of it
 The Bankruptcy Acts of 1841 and 1867 gave federal district courts concurrent jurisdiction with state courts to conduct plenary trials involving suits by the trustee (assignee) against an adverse third party. Congress deleted that provision in the original Act of 1898, but reinserted it by amendments in 1903 and 1910. Bardes v. First National Bank of Hawarden, 178 U.S. 524, 20 S.Ct. 1000, 44 L.Ed. 1175 (1900). See Schumacher v. Beeler, 293 U.S. 367, 55 S.Ct. 230, 79 L.Ed. 433 (1934) (discussing federal court jurisdiction following the 1903 and 1910 amendments). Each bankruptcy act until the 1978 Act, however, provided that actions to avoid preferential and fraudulent conveyances were to be tried outside the bankruptcy forum.
 As explained by the Court's historical analysis in Bardes, that rule was strictly a creature of various congressional acts. Prior to the 1903 amendment, section 23(b) of the 1898 Act provided:
 (b) Suits by the trustee shall only be brought or prosecuted in the courts where the bankrupt ... might have brought or prosecuted them if proceedings in bankruptcy had not been instituted, unless by consent of the proposed defendant.
 In reviewing the jurisdiction of federal trial courts to entertain, in a bankruptcy proceeding, an action to set aside preferential or fraudulent transfers, the Court in Bardes said that under the 1867 Act federal trial courts had two types of jurisdiction in bankruptcy matters:
 First, jurisdiction, as a court of bankruptcy, over the proceedings in bankruptcy ... ending in the distribution of assets amongst the creditors, and the discharge ... of the bankrupt; secondly, jurisdiction, as an ordinary court, of suits at law or in equity brought by or against the assignee in reference to alleged property of the bankrupt, or to claims alleged to be due from or to him.
 Bardes, 178 U.S. at 531, 20 S.Ct. at 1003 (quoting Lathrop v. Drake, 91 U.S. (1 Otto) 516, 23 L.Ed. 414 (1875)).
 The Court went on to note that in its original form, the 1898 Act omitted the second type of jurisdiction, and only state courts could at that time entertain actions to set aside preferences or fraudulent conveyances.
 Under the act of 1867, then, the distinction between proceedings in bankruptcy, properly so called, and independent suits, at law or in equity, between the assignee in bankruptcy and an adverse claimant, was distinctly recognized and emphatically declared.
 Id. at 533, 20 S.Ct. at 1004.
 The Court also said:
 It was also repeatedly held by this court that the right of an assignee in bankruptcy to assert a title in property transferred by the bankrupt before the bankruptcy to a third person who now claimed it adversely to the assignee could only be enforced by a plenary suit at law or in equity, under the 2d section of the act of 1867; and not by summary proceedings under the 1st section thereof....
 Id. at 532, 20 S.Ct. at 1003.
 Proceedings in bankruptcy generally are in the nature of proceedings in equity; and the words "at law," in the opening sentence ... may have been inserted to meet clause 4, authorizing the trial and punishment of offenses....
 Id. at 535, 20 S.Ct. at 1005.
 The Court, again speaking of the 1867 jurisdiction before it was temporarily removed by Congress in the 1898 Act, said:
 The 1st clause provides that "the United States circuit courts shall have jurisdiction of all controversies at law and in equity, as distinguished from proceedings in bankruptcy" (thus clearly recognizing the essential difference between proceedings in bankruptcy, on the one hand, and suits at law or in equity, on the other), "between trustees as such and adverse claimants, concerning the property acquired or claimed by the trustees," restricting that jurisdiction, however, by the further words, "in the same manner and to the same extent only as though bankruptcy proceedings had not been instituted and such controversies had been between the bankrupts and such adverse claimants."
 Id. at 536, 20 S.Ct. at 1005. In its Sec. 23 analysis, the Court went on to say that an adverse third party claimant "shall not be brought within the jurisdiction of the national courts solely because the rights of the bankrupt and of his creditors have been transferred to the trustee in bankruptcy." Id. See also Schumacher v. Beeler, 293 U.S. 367, 55 S.Ct. 230, 79 L.Ed. 433 (1934) (discussing the effect of the 1903 and 1910 amendments on federal court jurisdiction over suits by the trustee against adverse third parties to recover property as preferences or fraudulent conveyances).
 
 
 [26]
 Types of bankruptcy actions that the bankruptcy court could resolve by summary disposition as "bankruptcy proceedings" have varied in the different acts. In Bardes, the Court set forth these categories and noted that the 1898 Act differed from the 1867 Act in that "[i]t specifies in greater detail matters which are, in the strictest sense, proceedings in bankruptcy." Bardes, 178 U.S. at 534, 20 S.Ct. at 1004. The 1898 Act specified nineteen such types of actions, including the appointing of receivers and trustees; authorizing them to conduct the bankrupt's business; exercising administrative control over cases; extraditing bankrupts; transferring cases to other bankruptcy courts; deciding substantive issues in some proceedings (such as adjudging persons to be bankrupt); allowing or disallowing claims; causing the estate to be collected and distributed to creditors; reviewing findings of the referee; discharging the bankrupt; and enforcing its orders through contempt powers. 1898 Act Sec. 2. This jurisdiction has varied. For a summary of modern jurisdiction, see Countryman, Scrambling to Define Bankruptcy Jurisdiction: The Chief Justice, the Judicial Conference, and the Legislative Process, 22 Harv.J. on Legis. 1, 35 (1985)
 
 
 [27]
 See supra note 25
 
 
 [28]
 The fact that they were not part of the bankruptcy proceedings at any given time, however, was simply dependent on federal statutory law. 1 Collier p 3.01[b][iii] at 3-36.1 (15th ed.). See also supra note 25
 
 
 [29]
 The successive bankruptcy statutes themselves have changed actions from plenary to summary proceedings. For example, under Sec. 58 of the Bankruptcy Act of 1800, claims of creditors could be tried before a jury. 2 Stat. 19-21, Sec. 58, reprinted in 10 Collier, Appendix at 1736 (14th ed). Under Sec. 1 of the Bankruptcy Act of 1841, debtors who were declared a bankrupt involuntarily could petition for a jury trial. Id. at 1738. Under Sec. 4 of that Act, bankrupts who did not receive a full discharge could demand a jury trial. As in Sec. 58 of the 1800 Act, a jury trial was available under Sec. 7 of the 1841 Act "to ascertain the validity and amount of ... debts or other claims" against the estate. Id. at 1743. Under Sec. 41 of the Bankruptcy Act of 1867, the debtor retained the right to demand a jury trial in an involuntary bankruptcy proceeding to determine if an act of bankruptcy had been committed. Id. at 1773-74. However, there was no provision for jury trials over the grant of discharges or allowance of claims. Section 2 of the 1898 Act specifically included in its grant of jurisdiction to courts of bankruptcy the authority to adjudge persons bankrupt, to allow or disallow claims against the estate, and to discharge (or not) bankrupts. These matters were within the bankruptcy proceedings, which would be summary. Id. at 1785-86. Section 19, however, retained the right to a jury trial with respect to the question of insolvency in an involuntary proceeding. Id. at 1797. Between the 1800 and 1898 Act, therefore, the boundaries of plenary versus summary jurisdiction were altered by legislative enactments as formerly plenary proceedings were changed to summary proceedings
 The Chandler Act of 1938, 52 Stat. 840 (1938), further increased the summary jurisdiction of the bankruptcy court. Section 50n provided for summary proceedings in suits over breach of an obligation of a bond furnished pursuant to the Act.
 Section 57l provided for summary jurisdiction over actions by the trustee to recover excess payments on claims or payments made on disallowed claims. The 1938 Act also provided for summary jurisdiction over a trustee's suit to recover property held pursuant to a lien voidable under Sec. 67, even absent consent of the adverse party. See 2 Collier p 23.04 (14th ed.). The 1978 and 1984 Acts continued that trend of increasing the bankruptcy court's summary jurisdiction.
 
 
 [30]
 See 1 Collier p 3.01[b][iv] (15th ed); see also Countryman, at 6-7
 A major impetus underlying this reform legislation has been the need to enlarge the jurisdiction of the bankruptcy court in order to eliminate the serious delays, expense and duplications associated with the current dichotomy between summary and plenary jurisdiction ...
 It is the purpose of new section 164 of title 28, United States Code, in conjunction with 28 U.S.C. section 1334 ... to eliminate entirely the present jurisdictional dichotomy between summary and plenary jurisdiction.
 S.Rep. No. 989, 95th Cong., 2d Sess. 17-18, reprinted in 1978 U.S. Code Cong. & Ad. News 5787, 5803-04.
 
 
 [31]
 Congress created the Commission on the Bankruptcy Laws of the United States in 1970, Act of July 24, 1970, Pub.L. No. 91-354, 84 Stat. 468. For a discussion of the proposals developed by the Commission and leading to the 1978 Act, see 1 Collier p 1.03 (15th ed.)
 
 
 [32]
 28 U.S.C. Secs. 1471, 1480 (repealed 1984). See generally, Levy, Trial By Jury Under the Bankruptcy Reform Act of 1978, 12 Conn.L.Rev. 1 (1979)
 
 
 [33]
 28 U.S.C. Sec. 157(a), (b)(1), (c)(1). See Northern Pipeline, 458 U.S. at 92, 102 S.Ct. at 2882. (Burger, C.J., dissenting); see generally, King, supra
 
 
 [34]
 See Barton v. Barbour, 104 U.S. (14 Otto) 126, 134, 26 L.Ed. 672 (1881); Bardes v. First National Bank of Hawarden, 178 U.S. 524, 535, 20 S.Ct. 1000, 1004, 44 L.Ed. 1175 (1900); Local Loan Co. v. Hunt, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934); Pepper v. Litton, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); Katchen v. Landy, 382 U.S. 323, 337, 86 S.Ct. 467, 476, 15 L.Ed.2d 391 (1966)
 
 
 [35]
 See 1 Collier p 3.01[b] at 3-87 (15th ed.); Matter of McLouth Steel Corp., 55 B.R. 357, 362-63 (Bankr.E.D.MI.1985); In re American Energy, Inc., 50 B.R. 175, 180 (Bankr.D.N.D.1985); O'Bannon, 49 B.R. at 766
 
 
 [36]
 See 1 Collier p 3.01[b][i] (15th ed.); McLouth Steel, 55 B.R. at 362; In re American Energy, 50 B.R. at 180; King, at 702-06. But see Note, at 545 et seq.; Taggart, at 260-61
 
 
 [1]
 11 U.S.C. Secs. 547, 548
 
 
 [2]
 As noted by the court, there were two such proceedings instituted by the trustee, one alleging voidable transfer of money and seeking an order requiring repayment or judgment for the transferred amount. The second complaint alleges voidable transfer of negotiable instruments, personal property and services. The relief sought in this second proceeding is judgment for the aggregate value of the transfers. Nowhere does the trustee seek reconveyance of property. Only the first of the two proceedings is here on appeal. The trustee and his co-plaintiff, Bluefield Holding Co., were treated as one by the parties and the district court. No question is made of Bluefield's participation in this proceeding
 
 
 [3]
 The avoiding powers employed by this trustee are codified in 11 U.S.C. Sec. 547 (Preferences); Sec. 548 (Fraudulent transfers and obligations); and Sec. 544 (Trustee as lien creditor and as successor to certain creditors and purchasers). 11 U.S.C. Sec. 544(b) authorizes the trustee to fill the shoes of an unsecured creditor and to seek avoidance of "any" transfer voidable under "applicable law." It is by virtue of Sec. 544(b) that the trustee can assert a claim under Virginia's voluntary conveyance statute
 
 
 [4]
 See Jackson, Avoiding Powers in Bankruptcy, 36 Stan.L.Rev. 725 (1984)
 
 
 [5]
 13 Elizabeth ch. 5 (1571). See Kent's Commentaries v. 2, p. 439 (3rd Ed.1836); Baird & Jackson, Fraudulent Conveyance Law and its Proper Domain, 38 Vand.L.Rev. 829 (1985)
 
 
 [6]
 The Seventh Amendment:
 In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved
 ....
 
 
 [7]
 See, generally, Pope, The Jury, 39 Tex.L.Rev. 426 (1961); Green, Jury Trial and Mr. Justice Black, 65 Yale L.J. 482 (1956); Howard, The Road from Runnymede: Magna Carta and Constitutionalism in America (1968 Univ. of Va. Press)
 
 
 [8]
 See Wolfram, The Constitutional History of the Seventh Amendment, 57 Minn.L.Rev. 639 (1973); Goebel, History of the Supreme Court of the U.S., Vol. I (1971 Macmillan and Co.)